## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAYMOND BONIESKIE,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0666 (PLF)** |
| ) | |
| **v.** ) | |
| ) | |
| **ALBERTO GONZALES,** ) | |
| **Attorney General, United States** ) | |
| **Department of Justice,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

### DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Alberto Gonzales, Attorney General, United States Department of Justice, respectfully submits his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dismissal is warranted because Plaintiff has failed to state a claim for failure to accommodate under the Rehabilitation Act. Alternatively, Defendant seeks an order granting Defendant summary judgment on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant respectfully submits the attached statement of material facts as to which there is no genuine dispute, a memorandum of points and authorities with exhibits, and a proposed order.

Dated: July 30, 2007

Respectfully submitted,

    /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

    /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

    /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT


**Of Counsel:**

Lucille C. Roberts
Deputy General Counsel
United States Marshals Service Headquarters
Office of General Counsel
Building CS-3, 12th Floor
Washington, DC 20530-1000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **RAYMOND BONIESKIE,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0666 (PLF)** |
| ) | |
| **v.** ) | |
| ) | |
| **ALBERTO GONZALES,** ) | |
| **Attorney General, United States** ) | |
| **Department of Justice,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS,**
**OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**I.      BACKGROUND**

Plaintiff Raymond L. Bonieskie is employed as a Deputy United States Marshal. Plaintiff has been employed with the U.S. Marshals Service (the "Agency") since August 20, 1990, and as a Deputy United States Marshal since August 4, 1998.  Compl. ¶¶ 5, 12.  For intermittent periods of time since May 1999, Plaintiff contends he has suffered from drug dependency and chronic pain.  Id. ¶ 13.

In the 1990's Plaintiff began suffering from a herniated disk and lumbar spinal stenosis.  Id. ¶ 18.  In February and May 1996 and again in May 1999, Plaintiff had lumbar spine operations to relieve lumbar nerve root compression.  Id.   These disorders caused Plaintiff nerve pain.  Id.  After his back surgeries, Plaintiff received an accommodation by being placed on light duty while he recovered from each of his surgeries.  Exhibit ("Ex.") A, excerpts from the deposition of Raymond Bonieskie dated June 21, 2006 ("Bonieskie Dep.") at 20-21, 34-35.

Plaintiff never informed any Agency official or employee that he was unable to complete the physical requirements of the job, and in fact, was able to perform his job duties on a regular basis.  Id. at 53-54.

     In the summer of 2004, Plaintiff alleges that he began abusing Percocet, a prescription medication he was given to control the pain associated with disk herniation and lumbar spinal stenosis, by consuming the drug in excess of the prescribed amounts on a regular basis.  Compl. ¶¶ 18, 20.  According to Plaintiff, in June 2004, he suffered memory lapses and blackouts, which he attributed to his excessive use of prescription drugs.  Id. ¶ 21.  Around this same time, Plaintiff was prescribed Ambien, a sleep aid, which, in addition to the Percocet, he contends he began to take regularly.  Id. ¶ 22.    In late September 2004, Plaintiff contacted the Agency's Employee Assistance Program ("EAP"), after he had stopped taking the Percocet.  Id. ¶ 23.  Plaintiff spoke with Mr. Tom Madden, a counselor employed by the Agency's contractor, to request a recommendation for a drug treatment program.  Id.  Plaintiff contacted the recommended program but he felt that the counselor he spoke with was not sufficiently interested in Plaintiff's problem.  Id.  Plaintiff again contacted Mr. Madden, however, according to Plaintiff, Mr. Madden was not responsive to Plaintiff's concerns.  Id.  According to Plaintiff, he informed Mr. Madden that he was going to try to abstain from taking Percocet on his own. Id.  According to Plaintiff, Mr. Madden did not discuss recovery or recommend another program for Plaintiff.  Id.

     Plaintiff, who was formerly employed as an Employee Relations Assistant with the Agency, was aware that his contact with the EAP was confidential and that no one in the Agency would know that he contacted EAP.  Ex. A, at 8-9.  None of Plaintiff's supervisors were

aware that Plaintiff was misusing prescription drugs. Nor did Plaintiff notify any Agency official, supervisor or employee that he was misusing prescription drugs, or that he had an alleged drug dependency. Id. at 65-66, 73-76, 90, 99, 173. At no time did Plaintiff ever request an accommodation from any Agency official or representative for his alleged dependency on prescription drugs. Ex. A, at 55.

In November 2004, Plaintiff re-injured his back when attempting to assist in lifting a prisoner. Compl. ¶ 24. As a result, Plaintiff contends that he was prescribed Percocet again. Id. ¶ 25. According to Plaintiff, he had become addicted to Percocet as well as Ambien. Id. ¶ 26. As a result of his alleged prescription drug abuse, Plaintiff contends that, at nighttime, he would sleepwalk around the house; make meals, often leaving the stove on; and would argue with his wife but have no memory of these events in the morning. Id. Plaintiff testified that other effects of his drug dependency included being irritable, not being able to control his prescription drug dosages, and getting up in the middle of the night. Ex. A, at 65. Plaintiff testified that his personal appearance at work also began to suffer as a result of his prescription drug abuse because he was only taking one or two showers a week. Id. at 72-73. However, Plaintiff was working in the field doing interviews and thus his supervisors did not see him on a daily basis. Id. at 73.

According to Plaintiff, on the morning of February 9, 2005, Plaintiff called his office and reported he was sick, took an Ambien, and went back to sleep. Id. at 127-29. Later that morning, Plaintiff alleges that his wife asked him to leave the home because of bizarre behavior he had exhibited. Id. at 129; Compl. ¶ 29. Plaintiff contends that he packed some of his belongings and checked into a hotel. Compl. ¶ 29. Plaintiff also contends that he took

3

another Ambien and went to bed.  Id.  Plaintiff next contends that he awoke a few hours later,

still half-asleep and under the effects of the Ambien.  Id. ¶ 30.  He alleges that he put on two

coats, entered his government owned vehicle ("GOV") with the intent of driving home to

retrieve more of his belongings, and, then drove approximately 75 to 100 feet in the parking lot.

Id.  Plaintiff then crashed his GOV  into the back of a pickup truck in the parking lot of the hotel.

Id.  See also Ex. B, Affidavit Regarding Loss or Damage to Government Property.

        As a result of his misconduct and the circumstances surrounding the above described

accident, the Agency issued a proposal to remove Plaintiff from his position.  Ex. C,

Memorandum dated January 20, 2006 regarding proposed removal.  Plaintiff was charged with

"Driving a GOV while Impaired" and "Damage to Property."  Id. at 3.  Through his attorney,

Plaintiff submitted a written response to the proposal to remove him in which he accepted full

responsibility for his actions.  Ex. D, Letter to U.S. Marshal Robert Finan II dated February 24,

2006, at 1.  Plaintiff contended that his driving of his government vehicle while impaired was a

result of a disability involving drug dependency.  Id.  Plaintiff further alleged that since the

accident he had undergone rehabilitation through an EAP sponsored treatment program.  Id. at 1-

2.  After consideration of Plaintiff's written response to the proposal to terminate him, the

Agency's deciding official mitigated Plaintiff's proposed removal to a demotion from a Deputy

U.S. Marshal ("DUSM") GS-1811-12/3 to a GS-0082-11/5 effective April 2, 2006.  Ex. E,

Memorandum dated March 28, 2006.  Plaintiff was also suspended for a period of thirty days,

from May 1, 2006, through May 30, 2006.  Id.

## II.    STANDARD OF REVIEW

Defendant seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Alternatively, should the Court refer to the documents attached to the motion, Defendant seeks summary judgment pursuant to Federal Rule of Civil Procedure 56.

Recently, the Supreme Court has expounded on the oft-quoted standard for dismissal contained in Conley v. Gibson, 355 U.S. 41 (1957), noting that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted) (emphasis added). Thus, in order for a complaint to survive dismissal, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. (citations omitted). This requires a plaintiff seeking to avoid dismissal to state "circumstances, occurrences and events" that support the legal claim presented rather than merely make a "bare averment" that he is entitled to relief. Id. at 1965 n.3. Dismissal is required if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate when the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, the trier of fact must view all the facts, and the reasonable inferences to be drawn from them, in a

light most favorable to the non-moving party. Anderson, 477 U.S. at 255. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. In order to withstand summary judgment, the non-moving party is not at liberty to rest upon mere allegations or denials but must come forth with evidence establishing a material issue of fact for trial. Id. at 248. The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact. Id. at 247-48. If the submitted evidence is of such a character that it would not permit a reasonable fact-finder to find in favor of the non-moving party, summary judgment is appropriate. Id. at 251.

## III.    ARGUMENT

### A.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR FAILURE TO ACCOMMODATE UNDER THE REHABILITATION ACT.

In his one count complaint, Plaintiff alleges that he was denied a reasonable accommodation because the Agency was on notice of Plaintiff's disabilities but failed to provide any reasonable accommodation. Compl. ¶ 47. To establish a prima facie case of failure to accommodate under the Rehabilitation Act, Plaintiff "must show (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (citations and internal quotation marks omitted), appeal dismissed by, No. Civ.A. 02-5160, 2002 WL 1560032 (D.C. Cir. July 16, 2002).

Dismissal is required in this case because, based on the allegations of Plaintiff's complaint, it is apparent that he is not disabled within the meaning of the Rehabilitation Act.

Specifically, Plaintiff fails to indicate that he has (or had) a disability that significantly limited any of his major life activities.  Furthermore, even assuming Plaintiff was disabled, the irrefutable evidence demonstrates that none of his supervisors were even aware of his alleged disability and that he never requested any reasonable accommodation.  For these reasons, Plaintiff cannot establish a prima facie case for failure to accommodate under the Rehabilitation Act.

> **1.  Plaintiff is Not Disabled Within the Meaning of  the Rehabilitation Act.**

Plaintiff cannot establish he is an individual with a disability under the Act.  "A person is disabled under the Rehabilitation Act if he 'has a physical or mental impairment which substantially limits one or more of [his] major life activities; has a record of such an impairment; or is regarded as having such an impairment." Thompson v. Rice, 422 F. Supp. 2d 158, 166 (D.D.C. 2006) (quoting 29 U.S.C. § 705(20)(B)).  In making a determination of whether Plaintiff is disabled, the Court can refer to the standards utilized by the Americans with Disabilities Act, ("ADA").  See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12111, et seq.)); Thompson, 422 F. Supp. 2d at 166 & n.6 ("The liability standards of the Rehabilitation Act and the ADA are the same in employment discrimination cases, and thus cases interpreting either statute are applicable in defining the terms 'disability' and otherwise determining liability.") (citing 29 U.S.C. § 794(d)).  "It is the plaintiff's burden to prove that he is disabled." Haynes v. Williams, 392 F.3d 478, 482 (D.C. Cir. 2004).  Plaintiff cannot satisfy the definition of an individual with a disability as defined under the Act.

7

Plaintiff has failed to allege in his complaint that his alleged impairment affected any of his major life activities. "Major life activities" include functions such as "caring for oneself; performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I); 45 C.F.R. § 84.3(j)(ii).[1] To qualify as a disability, an impairment's impact must be "permanent or long-term." Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002) (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)). Under ADA regulations pertinent to determining whether an individual is substantially limited in a major life activity, factors to consider are: (1) "[t]he nature and severity of the impairment;" (2) [t]he duration or expected duration of the impairment;" and (3)"[t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment[.]" 29 C.F.R. § 1630.2(j)(2). Plaintiff does not have a physical impairment that meets any of these criteria.

As described in his complaint, Plaintiff 's alleged disability is "drug dependency" and "chronic disabling pain." Compl. ¶¶ 13, 34. While Plaintiff alleges that his disability "has limited his ability to engage in certain major life activities . . . ." Compl. ¶ 14, he fails to provide any description of the major life activities that were substantially limited by his disability.

---

[1] "To establish a substantial limitation on the major life activity of working, plaintiff would have to allege and prove . . . '[his] impairment prevents [him] from performing a 'substantial class' or 'broad range' of jobs otherwise available to [him]' rather than demonstrating that [he] is unable to do her specific job.") (citations omitted). Coleman-Adebayo v. Leavitt, 326 F. Supp. 2d 132, 143 & n.7 (D.D.C. 2004)); Thompson, 422 F. Supp. 2d at 171 (holding that plaintiff's Rehabilitation Act claim could not "succeed because she has not shown that she is excluded from a substantial class or broad range of jobs. Her characterization of the broad range of jobs as 'working in the Foreign Service' is inconsistent with the standards articulated [by the Supreme Court and District of Columbia Circuit]."). "This [discussion] assumes, of course, that working qualifies as a major life activity, a premise that the Supreme court has questioned." Coleman-Adebayo, 326 F. Supp. 2d at 143 & n.7 (citations omitted).

Rather, Plaintiff asserts that his drug dependency caused him to get out of bed at nighttime, still asleep, and walk around the house. Compl. ¶ 26. Plaintiff contends that he would make meals, often leaving the stove on. Id. He would also argue with his wife but have no memory of these events in the morning. Id. Plaintiff testified that other effects of his drug dependency included being irritable, not being able to control his prescription drug dosages, and not taking showers as regularly as he previously had. Ex. A, at 65, 72-73. None of these allegations suffice to demonstrate that Plaintiff was significantly limited in any major life activity.

Plaintiff was clearly not significantly limited in the major life activity of work. Rather, the evidence shows that, aside from sick leave and light duty that he was given in regards to his back surgeries, Plaintiff was able to perform all of his duties and he never requested any accommodation. Compl. ¶ 12 (noting that Plaintiff has been employed for 16 years); ¶ 24 (stating that Plaintiff re-injured his back while working in November 2004, despite addiction that began in June 2004); Ex. A, at 55. In fact, Plaintiff does not allege that his disability affected his work performance in any way. It was only because he was involved in a car accident, outside of work, that his disability became an issue at all. Because Plaintiff has failed to allege that he was substantially limited in any major life activity, he is not disabled for purposes of the Rehabilitation Act, and is not entitled to the Act's protections. See Twombly, 127 S. Ct. at 1964-65 (In order for a complaint to survive dismissal, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . [,] and "a formulaic recitation of the elements of a cause of action will not do . . . .") (citations omitted) (emphasis added). See also Scarborough, 190 F. Supp. 2d at 23 (granting summary judgment on plaintiff's Rehabilitation Act claims where "plaintiff cannot show that he was substantially limited in the major life

activity of working–or any other major life activity–and therefore cannot make out a prima facie

case of discrimination under the Rehabilitation Act.") (citation omitted).

## 2.    Plaintiff's Supervisors Had no Notice of His Alleged Disability.

Despite his allegation in his complaint that "Defendant was on notice of the Plaintiff's

disabilities . . . ." Plaintiff cannot show that any U.S. Marshal personnel were aware of his

alleged disability.  Plaintiff repeatedly testified during his deposition that he did not tell any of

his supervisors about his alleged drug dependency.  Ex. A,  at 65-66, 73-76, 90, 99, 173.

Plaintiff does not contend that his work performance suffered as a result of his alleged drug

dependency; although he testified that his appearance suffered because he took less showers, he

also testified that he was not in the office daily and thus his supervisors would not have been

aware of the change in his appearance.  Id. at 72-73.  For there to have been disability

discrimination under the Rehabilitation Act, Plaintiff must show that the Agency was aware of

his disability, and not "merely . . . aware[ ] of some deficiency in . . . [Plaintiff's] performance

that might be a product of an unknown disability."  Crandall v. Paralyzed Veterans of America,

146 F.3d 894, 897 (D.C. Cir. 1998).  Because Plaintiff cannot establish that his supervisors, or

any Marshal Service employees, were aware of his disability, he cannot establish a failure to

accommodate claim.  See Goodman v. Potter, 412 F. Supp. 2d 11, 16-17 (D.D.C. 2005) (holding

that "[n]o reasonable juror could find . . . that defendant was aware of [the plaintiff's] need to

work the day shift and nevertheless denied her request[,]" and granting summary judgment to

employer on plaintiff's Rehabilitation Act claim), aff'd, No. Civ.A. 06-5071, 2006 WL 4449339

(D.C. Cir. Nov. 14, 2006); Scarborough, 190 F. Supp. 2d at 24 (the Rehabilitation "Act only

applies when a plaintiff's employer has 'an awareness of the disability itself . . . .'") (quoting

10

<u>Crandall</u>, 146 F.3d at 897).

### 3.    Plaintiff Never Requested Any Reasonable Accommodation.

"An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." <u>Flemmings v. Howard Univ.</u>, 198 F.3d 857, 861 (D.C. Cir. 1999). Here, Plaintiff never requested <u>any</u> accommodation from his supervisors. Specifically, Plaintiff testified:

> Q.    Okay. Did you at any time ask for an accommodation other than a light duty which you've stated?
>
> A.    No.
>
> Q.    Did you at any time prior to February 9, 2006, ask for an accommodation other than the light duty accommodation?
>
> A.    I had submitted - - I was off for a week. I don't know if you want to consider it an accommodation. I took sick leave for a week at some point because my back was giving me a lot of problems in 2004.
>
> Q.    Okay. But other than that?
>
> A.    I don't recall asking for an accommodation, no.

Ex. A, at 55. Plaintiff's deposition testimony sounds the death knell for his claimed denial of a reasonable accommodation. <u>See</u> <u>Flemmings</u>, 193 F.3d at 862 (granting summary judgment in favor of employer where evidence showed that employee did not make request for revised work schedule during the time she was disabled as defined by the ADA); <u>Scarborough</u>, 190 F. Supp. 2d at 27 (granting summary judgment in favor of employer where the plaintiff could not "overcome the undisputed evidence that he did not request a reasonable accommodation."); <u>Evans v. Davis Memorial Goodwill Services</u>, 133 F. Supp. 2d 24, 27 (D.D.C. 2000) (granting summary judgment in favor of employer based, in part, on plaintiff's failure to "present[ ]

11

evidence that he sought any accommodation related to the disability he describes in his pleadings."), aff'd, 1 Fed. Appx. 3 (D.C. Cir. 2001).

In his complaint, Plaintiff contends that his request for a reasonable accommodation was made "in the form of a request for EAP counseling services relating to his addiction to Percocet in September 2004." Id. ¶ 36.  Yet, Plaintiff does not contend that his managers had reason to know about his contact with the EAP; in fact, he testified at his deposition that he knew the EAP process was "confidential." Ex. A, at 8-9.  At no time does Plaintiff contend that he made a direct request for an accommodation from his supervisors, or from any other management official at the Agency, and he repeatedly testified that his supervisors were unaware of his alleged disability. Ex. A, at 65-66, 73-76, 90, 99, 173.  Cf. Crandall, 146 F.3d at 897 (holding that employee could not establish he was terminated in violation of the Rehabilitation Act where he never provided notice to his employer regarding his alleged disability).

Plaintiff also contends that the Agency was put on notice of his disability in Plaintiff's "oral response on March 3, 2006 and in his written response on February 24, 2006." Compl. ¶ 37.  However, at the time of this alleged request Plaintiff had already undergone rehabilitation through an EAP-sponsored program and claimed to be fully ready to return to full-time duty; thus, it is not apparent what accommodation he could have been seeking. Ex. D, at 1-2.  Cf. Flemmings, 193 F.3d at 862 (granting summary judgment in favor of employer where evidence showed that employee did not make request for revised work schedule during the time she was disabled as defined by the ADA).  In any event, Plaintiff does not contend that he requested any specific accommodation at that time and he fails to explain how his notice to the Agency through his oral and written responses to his proposed removal required the Agency to propose

prospective accommodations, particularly when he claimed at the time to be fully rehabilitated. It is the employee's, not the employer's, duty to identify and propose a reasonable accommodation. See Evans, 133 F. Supp. at 27 (noting "[t]he disabled employee typically has the burden of providing notice of the disability and the limitations it imposes. . . . It similarly lies with the disabled employee to request needed accommodation.") (citing Flemings, 198 F.3d at 857) (other citation omitted). For these reasons, Plaintiff's failure to accommodate claim should be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendant requests that the complaint be dismissed. Alternatively, Defendant is entitled to summary judgment in his favor.

Dated: July 30, 2007

Respectfully submitted,

_/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_/s/ Michelle N. Johnson_____
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT

13

**Of Counsel:**

Lucille C. Roberts
Deputy General Counsel
United States Marshals Service Headquarters
Office of General Counsel
Building CS-3, 12th Floor
Washington, DC 20530-1000

EXHIBIT A

1

UNITED STATES MARSHALS SERVICE

RAYMOND BONIESKIE,                    )
                                      )
            Appellant,                )
                                      )
    v.                                )
                                      )
UNITED STATES MARSHALS                )
SERVICE,                              )
                                      )
            Agency.                   )

Deposition of:

RAYMOND BONIESKIE

a witness of lawful age, taken on behalf of the Agency,
pursuant to notice, at 1750 Crystal Drive, Square Three,
Seventh Floor Conference Room, Arlington, Virginia, on
June 21, 2006, at 10:00 a.m., before Christina Chesley,
Notary Public in and for the Commonwealth of Virginia
when were present:

    APPEARANCES:

    On behalf of Appellant:

    ROBERT P. WALDECK, Esquire
    John Berry, PLLC
    1990 M Street, N.W., Suite 610
    Washington, D.C.  20036
    (202) 955-1100

    On behalf of Agency:

    LUCILLE C. ROBERTS, Esquire
    United States Marshals Service
    12th Floor, Building CS-3
    Washington, D.C.  20530
    (202) 307-9054

        Heritage Reporting Corporation
            (202) 628-4888

Exhibit A

8

1      Q    Do you remember approximately when that was?

2      A    No.  It may have already been set up when I

3  got there.  I'm not really sure.

4      Q    Do you remember while you were an employee

5  relations assistant being aware that there was an EAP

6  program?

7      A    Yes.

8      Q    And at that point did you know how to access

9  that program if you chose to do so?

10     A    I knew you could go to a specialist.  I'm

11  not sure.  I can't remember if there was an 800 number

12  at the time, but I knew you could go to a specialist

13  and talk to a specialist.

14     Q    Okay.

15     A    And get help if you were having a crisis.

16     Q    And were you aware at that time that there

17  was a confidentiality surrounding the access to the

18  EAP program?

19     A    Yes.

20     Q    Okay.  So you understood that the employee

21  assistance program lent assistance, right?  Is that

22  correct?

23     A    I guess so.

24     Q    Okay.  That an employee can access it,

25  correct?

9

1       A       Yes, ma'am.

2       Q       And that the employee can do so with

3    confidentiality such that no one in the Agency had to

4    know other than the EAP?

5       A       Correct.

6       Q       Now, in your position as an employee

7    relations assistant, did you know that the employees

8    who drove vehicles had a responsibility to report

9    motor vehicle accidents with government vehicles?

10      A       Yes.

11      Q       And did you know there was a time period for

12   doing that?

13      A       No.  I really don't -- I never really --  I

14   mean, again if you had asked me, I would say yes there

15   probably is a timeframe, but that was not something

16   that I was aware of on any kind of level.

17      Q       And did you subsequently as a deputy U.S.

18   marshal learn that there was a time period?

19      A       No, no.

20      Q       Okay.  Now, in your capacity as an employee

21   relations assistant, were you involved in any way with

22   any cases involving drugs?

23      A       I remember seeing a couple on illegal drugs.

24   We had -- they would stop the random urine tests for a

25   while, and then when they started back up I know they

Heritage Reporting Corporation
(202) 628-4888

20

1          BY MS. ROBERTS:

2          Q     Now, you were telling me about your surgery

3     in October 1999.  Were you given prescription drugs

4     relative to that surgery?

5          A     Yes.

6          Q     And prescription drugs in the way that we've

7     described them?

8          A     Yes, ma'am.

9          Q     And what drugs were you given?

10          A     Percocet.

11          Q     Okay.  And did you follow the prescription?

12          A     Yes.

13          Q     And were you permitted to work while you

14     were on Percocet?

15          A     No.  Again, the use of the Percocet stopped

16     way before I was able to go back to work.  Even after

17     I was off Percocet I still needed to have my back

18     healed, and I think I probably -- a surgery like that

19     I believe I needed to be off about three to four

20     weeks.

21          Q     Okay.  Now, when you returned, did you come

22     back to light duty?

23          A     I came back to light duty.

24          Q     Okay.  And light duty is what?

25          A     Administrative work, running.  If you need

21

1   anything, if they needed someone to run the list over

2   there, the lockup list and make sure nobody had any

3   warrants, the warrant supervisor was kind enough to

4   let me work over there, and I worked on the project to

5   reorganize all the warrant holders over there.

6       Q    Okay.  On each occasion after your surgery

7   did you request light duty?

8       A    I don't know if I requested it or whether it

9   was just given until -- I think it was more assumed

10  until I could get a note from the doctor saying I was

11  ready to return to full duty.

12      Q    So it was a mutual agreement?

13      A    Yes.

14      Q    Between the Agency and yourself?

15      A    Yes, ma'am.

16      Q    Would you call it an accommodation?

17      A    I call it accommodation?  Light duty?  I

18  guess I was accommodated.

19      Q    Okay.  And you provided documentation from

20  your doctors as to your medical limitation on each

21  occasion?

22      A    You know, I don't know if I did or not, to

23  be honest with you.  I believe it was more along the

24  lines of when your doctor says you can come back to

25  full duty, bring us a note, and I believe that's

34

BY MS. ROBERTS:

1

2     Q    Okay. So, now at that point in time,

3 September 11 for example or that time period did you

4 find that you were having any problems with the

5 prescriptions that you were taking?

6     A    No.

7     Q    Problems in a sense of feeling like you

8 could not function?

9     A    Control? No.

10     Q    Okay. So after September 11, 2001, that

11 period of time, did you have any further

12 prescriptions?

13     A    For 2001? I don't think so.

14     Q    Okay.

15     A    I believe in 2001 I had a surgery that

16 summer for my knee.

17     Q    Okay.

18     A    And I'm sure I was on Percocet for probably

19 four or five days steady.

20     Q    Did you follow the prescription?

21     A    Yes, ma'am.

22     Q    No feeling of loss of control?

23     A    No.

24     Q    Okay. Now, did you go back to work on light

25 duty?

Heritage Reporting Corporation
(202) 628-4888

35

1  A  Yes, ma'am.

2  Q  Okay.  And when your doctor released you,

3 you went back to work as a full-time, full-service

4 deputy U.S. marshal?

5  A  Yes, ma'am.

6  Q  Okay.  Were you taking Ambien?

7  A  I don't believe I was at that time, no.

8  Q  Okay.  When was the next prescription of

9 either Ambien or Percocet?

10  A  I'm sure during the 2002 year.  I had

11 another surgery.

12  Q  Okay.

13  A  I know my back was bothering me still, and I

14 was doing intermittent -- I had put on a lot of weight

15 because I could not -- I put on a lot of weight which

16 was causing more problems with my back.  I'm sure

17 that -- I believe I was probably taking Percocet

18 intermittently as needed then.

19  Q  For the surgery?

20  A  Well, no.  It was for the back pain.

21  Q  Before the surgery?

22  A  Before the surgery.  The surgery was a

23 gastric bypass to lose weight.

24  Q  Okay.  Okay.  So you were taking Percocet in

25 2002 for back problems?

53

1    increase over two years or so.

2        Q    Which years?

3        A    Probably 2002 maybe through 2004.  I mean,

4    like I said my consumption would go up maybe some.  It

5    would go back down, and then it would go up and go

6    back down, and it was pretty much following the level

7    of the pain that was steadily increasing over that

8    time.

9        Q    During the period 2002 to 2004, were you

10   required to take physical fitness tests?

11       A    I believe I took a couple of them, yes.  I

12   mean, they're a lot more strict about those now.

13       Q    Did you ever present a doctor's note to your

14   supervisors to say I can't run a mile today, or I

15   can't do what is necessary to do a fitness test.  Did

16   you ever do that?

17       A    No, I would gut it out, and by that time I

18   was over 40, so I could use the bicycle for my fitness

19   test which was a lot easier on my back and my body.

20       Q    Okay.  So you have never asked based on a

21   doctor's note or excuse to get a waiver from any

22   physical requirements in your testing during that

23   period?

24       A    I believe, no.  I believe they were doing

25   fitness tests around postsurgery, and I was on light

Heritage Reporting Corporation
(202) 628-4888

54

1    duty and couldn't do them then, but I don't ever

2    recall getting a note or any type of waiver.

3        Q    Okay.

4        A    I could not even tell you how many I did if

5    very many, and probably the ones I did I gutted out.

6        Q    Okay.  Did you ever ask to be excused from

7    not qualifying at the shooting range based on any

8    medical problems?

9        A    No.

10       Q    You never brought a note and said I can't

11   shoot today or anything like that?

12       A    No.

13       Q    Did you ever bring a doctor's note to be

14   excused from any type of duty as a deputy marshal

15   during the period of 2002 to 2004 excluding what you

16   described as your light duty restrictions?

17       A    No, I think they knew.  I mean, they knew.

18   They saw me take some time off because of the pain

19   that I was in, and they knew that I was in pain.  At

20   that point I was working on background investigations,

21   so it was a fairly light amount of physical work.  I

22   wasn't going out and working warrants.  I wasn't

23   trudging up and down stairs doing tasks, so it was

24   office work plus -- I mean, I was sitting there

25   typing, so really there was no reason to do so.

55

1       Q    Okay.  Did you at any time ask for an
2   accommodation other than a light duty which you've
3   stated?

4       A    No.

5       Q    Did you at any time prior to February 9,
6   2006, ask for an accommodation other than the light
7   duty accommodation?

8       A    I had submitted -- I was off for a week.  I
9   don't know if you want to consider it an
10  accommodation.  I took sick leave for a week at some
11  point because my back was giving me a lot of problems
12  in 2004.

13      Q    Okay.  But other than that?

14      A    I don't recall asking for an accommodation,
15  no.

16      Q    Okay.  So we're up to 2004, and you
17  indicated that your use of prescription drugs ebbed
18  and flowed during the period of 2002 to 2004.  Is that
19  correct?

20      A    Yes, ma'am.

21      Q    Was there a change in 2004 in the either
22  type or frequency of the drugs you were taking which
23  we are calling prescription drugs?

24      A    Yes, I had gone to -- my doctor had talked
25  to me about going to Johns Hopkins for some

65

1      Q     Did you take any action as a result of what
2   you realized?

3      A     I was more in denial at that point for
4   reasons -- I was more concerned about my back than
5   anything else at that point, so at that point I really
6   hadn't done anything about it.

7      Q     Okay.  When you say you were in denial, you
8   were in denial of what?

9      A     That it was becoming a problem.

10     Q     That what was becoming a problem?

11     A     My irritability, my seemingly not being able
12  to control my dosages, getting up in the middle of the
13  night and doing these things.

14     Q     Were you in denial of the fact that your
15  prescription drugs might be causing you to behave in a
16  way that you could not control?

17     A     Yes.

18     Q     So at that point you took no action to alter
19  the prescription drugs that you were taking?  Bad
20  word.  Let me rephrase that.  Did you talk to your
21  doctor about the activities you thought were abnormal
22  that you just described?

23     A     No.

24     Q     Did you talk to any Marshal Service
25  personnel about these activities?

Heritage Reporting Corporation
(202) 628-4888

66

1       A    Marshal Service personnel?  No, I did not.

2       Q    Okay.

3       A    And at what point are we talking about?
4   What timeframe?

5       Q    We're talking about the timeframe you just
6   described late spring, early summer 2004.

7       A    Okay.

8       Q    When you realized that you were acting in a
9   semi-sleep state and performing certain activities.

10      A    In late spring, early summer it was not very
11  often.  I hate to jump around like this.  I honestly
12  am trying to remember exactly how that whole thing
13  went.

14      Q    That's fine.

15      A    I believe at that point it happened a couple
16  of times, and I was a bit concerned about getting up
17  in the middle of the night.  I would vaguely remember
18  the next day.  I was more concerned when I would yell
19  at my kids, scream at my kids.  At that point also by
20  early summer my aunt had died and my wife and children
21  were involved in a horrific car accident while I was
22  out in California attending my aunt's funeral.

23      Q    That's horrible.

24      A    I had to fly my -- I don't know if it's
25  relevant about the accident or not, but I had to fly

Heritage Reporting Corporation
(202) 628-4888

72

1    difference."

2            THE WITNESS:   Noticed difference in my

3    physical --

4            MS. ROBERTS:  Yes.

5            MR. WALDECK:  Ability to react.

6            THE WITNESS:  Ability to react.

7            BY MS. ROBERTS:

8        Q    Okay.  And you said that in retrospect you

9    believed that your reflexes were slow or something to

10   that effect?

11       A    Yes, I'm sure everything was getting pretty

12   messed up at that point.

13       Q    Did you notice any differences in your

14   behavior or your ability at work?

15       A    Yes.  We're talking July to August at this

16   point?

17       Q    Yes, in 2004.

18       A    2004.  Yes, my personal hygiene had pretty

19   much been sacrificed.  I was only taking one or two

20   showers a week where I usually used to take a shower

21   daily.  I was going in very tired, putting my head

22   down on the desk, have a hard time concentrating,

23   forgetting things, leaving things where I shouldn't

24   have.

25       Q    Like what?

                Heritage Reporting Corporation
                        (202) 628-4888

73

1    A    I was told later on I had left a couple of

2    files out in the U.S. Attorney's office out in the

3    waiting room on the 11th floor up there.  I believe I

4    left them out in a semi-public area.  I didn't know

5    that at the time.  I found that out later on.  Just a

6    general lack of -- my work production had gone down

7    quite a bit.  I was not producing the amount of work I

8    was before.

9    Q    Okay.  Anything else?

10    A    That's pretty much it, but just general

11    appearance, you know, my appearance had been shot,

12    work product, not caring as much, putting my head

13    down.  I was working on backgrounds, so I did not --

14    it was easier to get away with it at the time I guess.

15    People didn't notice as much I guess because I was

16    working alone more.

17    Q    Were you working out of the office?

18    A    Yes, and in the field doing interviews.

19    Q    So your supervisors would not see you on a

20    daily basis to notice the change?

21    A    No, no.

22    Q    Okay.  But you were aware of the changes?

23    A    I was aware of the changes.

24    Q    Did the changes seem dramatic to you?

25    A    Gradual then after we came back from Disney

74

1    World in August and September, especially after the

2    holidays, after Labor Day it's like it goes gradually

3    and steeper, steeper and then like that.

4        Q    Okay.

5        A    It's my hygiene, behavior, basic mental

6    focus and things like that.

7        Q    Okay.  We are on an audio system.

8        A    I'm sorry.

9        Q    No, no, no.  That's all right, and correct

10   me if I'm wrong let the record reflect that the

11   witness had his hand up and then took a slope down.

12       A    I can actually probably describe it.

13       Q    Okay.

14       A    It's like being on a roller coaster.  When

15   you come over the top of the roller coast, you get a

16   slight dip, and then it goes into a very steep dive

17   probably would be the best way to describe it.

18       Q    Much better story.

19       A    Thank you.

20       Q    So during the gradual decline, did you have

21   any conversations at work as to the problems you were

22   experiencing?

23       A    No.

24       Q    With the Marshal Service?

25       A    No.  At one point, no, no.

75

1       Q    Did you after the gradual decline became a

2   dramatic decline have any conversations with anyone in

3   the Marshal Service about the problems you were

4   experiencing?

5       A    No.

6       Q    Okay.  Did you at any point ask anyone to

7   accommodate you for the problems you were

8   experiencing?

9       A    At that point, no.

10      Q    No?  Okay.  Now, did you recognize yourself

11  as having a problem?

12      A    Again, the best way to describe this would

13  be over the course okay I don't have a problem, things

14  like okay, it's a problem, but I can control it.  Then

15  it's trying to set up levels of control, and then

16  thinking that finally you get to the point of okay

17  there seems to be a real problem, and that was mid to

18  late September  2004.

19      Q    Okay.

20      A    And that's when I just stopped all Percocet.

21      Q    Okay.  Let's go back to the summer.

22      A    Sure.

23      Q    From June to August.

24      A    Sure.

25      Q    Did you talk to your doctors about what was

Heritage Reporting Corporation
(202) 628-4888

76

1    happening?  Any of them?

2        A    No.

3        Q    Did you talk to any professionals, either

4    psychologists, counselors, any of them?

5        A    No, I was too embarrassed to talk to

6    anybody.  It was denial at first, and when I finally

7    realized there was a problem -- well, no.  You said

8    through August of 2004?

9        Q    Yes.

10       A    No.  Late August I realized it was becoming

11   a real problem, and I'd go off for a day or two, and

12   my back would really start really killing me again,

13   and I'd go back on, and for someone who never drank

14   very much, who never took, you know, who always prided

15   themselves -- I had a lot of alcoholism in my family,

16   and I swore any substance abuse would never happen to

17   me.  It was a real blow to my ego.  I was very

18   embarrassed at that point.  I was embarrassed.

19       Q    Now, I believe I read that your sister is an

20   addiction specialist?  Is that correct?

21       A    Yes, but we don't get along very well.

22       Q    So you didn't have any conversation with

23   her?

24       A    Not at all.

25       Q    Or your parents?

Heritage Reporting Corporation
(202) 628-4888

90

1    a car, but I could not tell you with a virtual

2    certainty.

3        Q    Well, let me ask you.  Were you driving a

4    GOV at any point?

5        A    No.

6        Q    Okay.

7        A    No, no, no.  When I'm gone that long

8    sometimes you'll leave it at work, and you'll just

9    have somebody drive you home.  I can't say for sure I

10   did that, but no I was not driving the GOV at all.

11       Q    Okay.  When you came back to consciousness,

12   did you make any efforts to speak to any professional

13   such as a doctor or a counselor or psychologist?  Any

14   medical or psychological person?

15       A    No.  I chalked it up to being under a lot of

16   stress and being extraordinarily tired.  I just kind

17   of chalked it up to that.

18       Q    Okay.  Did you at any point up until then

19   contact the EAP?

20       A    No.  No, ma'am.

21       Q    Okay.  Did you notify anyone in the Marshall

22   service of your problems?

23       A    No, I did not.

24       Q    Okay.  Did you recognize at that point that

25   you had a problem with the prescription drugs you were

99

1    go off of them, and I would occasionally go off for

2    two or three days just to prove I could stay off.

3         Q    Okay.  Did you recognize yourself as being

4    in withdrawal at that time?

5         A    Near the very end I did.

6         Q    The very end of what?

7         A    In September.

8         Q    So the end of September you recognized your

9    symptoms as withdrawal?

10        A    Yes.

11        Q    And what information did you draw from that?

12        A    That I probably should go in and get some

13   help.

14        Q    Did you feel that you had a drug problem at

15   that point?

16        A    Yes, I believe at that point it was a

17   moderate to serious problem

18        Q    Okay.  Did you tell your supervisors?

19        A    No.

20        Q    You never told your supervisor anything

21   about this prior to February?

22        A    No, but I will tell you so many times I

23   would go stand in front of my supervisor's door and

24   think about going in and talking to him, and I wish I

25   did, but I didn't.

127

1        Q     What were the nature of your withdrawal

2    symptoms?

3        A     The same thing.  Flu-like.  Not anywhere as

4    bad as before, and I was still going to -- I mean,

5    it's very foggy at this point.  I mean, I remember

6    thinking to myself, you know, I woke up, and it was

7    just very -- I mean, I remember thinking okay.  I

8    don't feel well, I'm tired, I don't feel normal, and

9    my back was really bothering, so I called in.

10        Q     Okay.

11        A     And I decided to go back to sleep.

12        Q     Okay.  So that would have been about what

13    time in the morning that you called in?

14        A     It's very sketchy.  Between 7:30 and 8:30.

15        Q     Okay.

16        A     The best you're going to get out of me is a

17    one- or two-hour range because I really --

18        Q     Okay.  That's fine.  So you had taken the

19    Ambien the night before.

20        A     Yes.

21        Q     You called in sick.  You went back to sleep?

22        A     Yes, ma'am.

23        Q     And you did sleep at that time?

24        A     That morning?  Yes, apparently I had gotten

25    up not long afterward and apparently -- I mean, I have

128

1    no -- this is where it starts getting.  There were

2    things I was told and things I sort of remember.

3         MR. WALDECK:  We'll have to think about

4    that.  Can we step out for a second?

5         MS. ROBERTS:  Sure.

6         MR. WALDECK:  We have to talk about where we

7    can go.

8         (Discussion held off the record.)

9         THE WITNESS:  The last clear memory I have,

10   the last crystal clear memory I had was the night

11   before.  The next day, you know, I remember getting

12   up.  I remember feeling -- that was still a little bit

13   hazy, but I still have pretty good -- my faculties

14   together at that point.  I went back to sleep.  At

15   some point I vaguely remember getting up, walking out

16   to my hallway, stumbling down the stairs.

17        BY MS. ROBERTS:

18   Q    This was after your call to the Marshal

19   Service?

20   A    That's after I called and called in sick.

21   Q    Okay.

22   A    I have no idea how long afterwards.  If you

23   told me it was 15 minutes or a half hour afterwards, I

24   would be surprised.  If you said it was two

25   afterwards, I wouldn't be surprised.  I pretty much

129

1    lost all track of time at that point.

2        Q    Okay.

3        A    My wife and daughter were in the kitchen.  I

4    came downstairs and stumbled, fumbled around, walked

5    back upstairs, slipping and falling up the stairs,

6    stumbled around and fell back into bed.  I vaguely

7    remember that.  I mean, it's nothing clear like I

8    said.

9            It was like I told you before kind of like

10   that dreamlike state that you sort of remember.  You

11   kind of sort of remember, and I remember my wife

12   coming to the foot of the bed and said you've got to

13   take care of this problem.  I'm taking Catherine out.

14   You need to leave the house until you get this taken

15   care of.

16       Q    And what problem was she referring to?

17       A    The prescription drug problem.

18       Q    Go ahead.

19       A    I laid there for probably several hours

20   until early or mid-afternoon.  I went and gathered up

21   a few things.  Got in my GOV and drove over to a hotel

22   by Dulles Airport.

23       Q    Okay.  Go ahead.

24       A    Again, checked in.  Managed somehow to check

25   in.  Went and crashed on the bed and said okay.  I

173

RE-EXAMINATION BY COUNSEL FOR AGENCY

BY  MS. ROBERTS:

Q    Did you ever tell anybody in the Marshal
Service that you were using Ambien?

A    Any what?

Q    Did you ever tell the Marshal Service that
you were using Ambien prior to February 9, 2005?

A    I don't know if I ever mentioned it to -- I
know I didn't tell anybody there.  Whether I mentioned
it to a medical professional or not, I'm not really
sure.  I may not have been using it at the time when I
went for my physical.  I did not tell anybody in my
district I guess is the answer.  Whether I told a
medical professional, I cannot remember.

Q    Do you have any recollection of telling any
Marshal Service official or supervisor that you were
taking Ambien?

A    No, I don't have a recollection.

MS. ROBERTS:  No further questions.

MR. WALDECK:  I think that's it then.

MS. ROBERTS:  Okay.  I think we're done.
Thank you.

(Whereupon, a short recess was taken.)

MS. ROBERTS:  Let's try -- I'm not sure what
this is.  Okay.  This is three and -- all right.

EXHIBIT B

JUN 01 2005 15:13 FR USM    SUPERIOR CRT 02 618 6665 TO    96    P.02



**U.S. Department of Justice**
United States Marshals Service
Business Services Division

## AFFIDAVIT REGARDING LOSS OR DAMAGE TO GOVERNMENT PROPERTY

CHECK APPROPRIATE BOX:
1. THIS AFFIDAVIT OF EVENT  PERTAINS TO GOVERNMENT PROPERTY THAT HAS BEEN
☐LOST  ☐STOLEN  ☐DESTROYED WITHOUT AUTHORIZATION
☐DISPOSED WITHOUT AUTHORIZATION  ☒DAMAGED

2. NAME OF PERSON MAKING STATEMENT
*Raymond Bonieskie*

3. TITLE OF PERSON MAKING STATEMENT
*Deputy U.S. Marshal*

4. EMPLOYER (AGENCY)
*USMS*

5. DISTRICT OR HQ, DIVISION/STAFF OFFICE
*DC/SC*

6. OFFICE TELEPHONE NUMBER
*202-616-2406*

7. I, *Raymond Bonieskie*  hereby solemnly ☒(swear) ☐(affirm) that the following information is given freely and voluntarily without promise or coercion.

8. PROPERTY DESCRIPTION (Give Complete Description, Including Make, Model, Serial Numbers, Etc.)
*2004 Ford Crown Vic - Blue - LLW-103*
*158137*

9. NCIC NUMBER (Firearms, Conveyances, Desktops, Laptops, PDA's and Other Equipment with Data Storage Capability, and Communications Equipment, i.e., Radios, Repeaters, etc.)

10. ADP/IT EQUIPMENT  ☐Yes ☐No
INFORMATION CONTAINED IN ADP/IT EQUIPMENT  ☐SENSITIVE ☐CLASSIFIED  ☐NEITHER

11. DATE OF EVENT
*02-9-05*

12. DATE EVENT DISCOVERED
*02-9-05*

13. TIME OF EVENT
*7 P.M.*

14. LOCATION OF EVENT (Also State Last Place and Time that Property was Accounted for)
*43 480 Catalina Ct, Sterling, VA*

15. PROPERTY ISSUED TO
Name: *Raymond Bonieskie*    Title: *Deputy U.S. Marshal*

16. HAND RECEIPT ISSUED
☐Yes ☐No (Attach copy if yes)

17. DISTRICT OFFICE,
*D.C./SC*

18. HEADQUARTERS DIVISION/STAFF OFFICE

19. CIRCUMSTANCES OF EVENT (Give Full Details, Including How and Why Event Occurred and Who Witnessed Event)
*I had moved out of my residence. At approx. 7 p.m. I needed to drive back to my previous residence to pick up some uniforms and USMS equipment. On the way out of the parking lot, I passed an automobile - I moved to the right to clear the auto. I over-compensated and hit a parked pick-up truck.*

20. REPORTED TO FBI S/AGENT (Name)

21. DATE REPORTED

22. LOCATION OF FBI OFFICE

23. REPORTED TO POLICE DEPARTMENT
(Name of Police Dept. and Officer)
*Loudoun County*

24. DATE REPORTED
*02-09-05*

25. ATTACH COPY OF LOCAL POLICE REPORT

26. SUBSCRIBED AND  ☐(SWORN TO)  ☐(AFFIRMED)
BEFORE ME AT *Ashburn Virginia.*
ON THIS *1st* DAY OF *June*, 20 *05*

NOTARY OR COURT CLERK'S SIGNATURE

27. A KNOWINGLY AND INTENTIONALLY FALSE ENTRY ON THIS FORM MAY BE GROUNDS FOR ADMINISTRATIVE DISCIPLINE AND MAY BE PUNISHABLE AS SET FORTH IN U.S. CODE TITLE 18, SECTION 1001.

*Raymond Bonieskie*    *6-1-05*
(AFFIANT'S SIGNATURE)    DATE

(PROPERTY CUSTODIAN'S SIGNATURE)    DATE

PRIOR EDITIONS ARE OBSOLETE AND NOT TO BE USED

Form USM-134
Rev. 03/05

*33*

EXHIBIT C

UNITED STATES GOVERNMENT

# memorandum

DATE:       JAN 3 0 2006

REPLY TO
ATTN OF:       MAY-ERT-2005-0201-NBU-NG

SUBJECT:       Proposed Removal

TO:       Raymond Bonieskie
          Deputy United States Marshal
          District of Columbia Superior Court

This is to inform you that I propose to remove you from your position as Deputy United States Marshal (DUSM), GS-1811-12, and from the Federal Service not earlier than 30 calendar days after receipt of this notice for Driving a Government Owned Vehicle (GOV) while Impaired and Damage to Property.

**BACKGROUND:**

An investigation by the United States Marshals Service (USMS) Office of Internal Investigation (OII) was conducted by Senior Inspector Noelle B. Douglas, following your accident with your GOV.

According to your sworn statement to OII, you were at home on sick leave on February 9, 2005, due to back problems. You had called in sick in the morning and then had taken a sleeping pill. When you woke, your wife asked you to move out of the house until you both could resolve some marital problems.

At approximately 2:00 p.m. you packed some clothes and equipment, and traveled to the Homestead Suites about 10 miles from your house.

According to your statement, you checked into the hotel, and took another sleeping pill and went to sleep until approximately 7:00 p.m. When you got up, you noticed that you needed more equipment and clothing that was still located at your house, for the following day. You went out to the parking lot and got into your GOV.

According to sworn statements by witnesses, you drove your GOV, at a high rate of speed, around the corner of the hotel parking lot and "plowed into the front end of a truck that was parked in the hotel parking lot." You started to back up as if to leave, and Michael Driscoll, the owner of the truck, who was on the scene, ran up and pounded on

your window and told you to stop. After fumbling around, you put a badge up against the window. Mr. Driscoll then walked around behind his truck to check on Debbie Van Dine, who had been standing behind the truck. When he returned, you were talking on your cell phone. Ms. Van Dine went into the hotel and the Loudoun County Sheriff's Office was notified.

According to the statement from Mr. Driscoll, after about 5 to 10 minutes, you exited your GOV, told him that you were a U.S. Marshal, and not to worry about anything. You then slipped to the ground. When he assisted you to stand up, he reported that you "reeked of alcohol – mainly vodka." Mr. Driscoll states that you had difficulty in standing, walking, and talking.

When Deputy T.J. DeLitta, Loudoun County, Virginia, Sheriff's Office arrived, Mr. Driscoll advised him that there had been no other vehicles around, and that you had hit his truck head on. Mr. Driscoll reported that Officer DeLitta put you into his patrol car numerous times but you kept getting out. Officer DeLitta removed your gun, took out the clip and chambered round, and placed the weapon in the patrol car. Officer DeLitta stated that although you did not smell of alcohol, you had slurred speech, red bloodshot eyes, were unsteady on your feet and your statements did not make sense.

In his statement, DUSM Jean (Chris) Selb reported that between 7:00 p.m. and 8:00 p.m. on February 9, 2005, he received a phone call from you on his Government Nextel phone. You asked him to meet you at a local hotel, but he had difficulty in understanding you. At that point, Officer DeLitta took the phone and asked DUSM Selb to come to the accident scene. Officer DeLitta stated that you had been involved in an accident, appeared to be intoxicated, and he wanted DUSM Selb to come and secure your weapon. When DUSM Selb arrived, Officer DeLitta asked DUSM Selb to take your weapon because he believed you were disoriented or under the influence. Officer DeLitta stated to DUSM Selb that he was not interested in arresting or detaining you, but only in turning you over to the Marshals Service and ensuring that you were safely transported. The Officer DeLitta completed his accident report and departed.

When DUSM Selb was asked by OII if he thought you were intoxicated he said, "I know he was." DUSM Selb took your weapon and took you to your house and retrieved your personal weapon. DUSM Selb notified U.S. Marshal (USM) Steve Conboy and Supervisor Deputy U.S. Marshal (SDUSM) Thomas Hedgepeth about the incident. SDUSM Hedgepeth requested that DUSM Selb take control over the other weapons that he knew you had at your house. When asked by OII why DUSM Selb thought SDUSM Hedgepeth had requested him to get the guns from the house, DUSM Selb replied that he had told SDUSM Hedgepeth that you were not yourself and that he thought SDUSM Hedgepeth was afraid you might harm yourself or others. DUSM Selb took the weapons to his house overnight and locked them in the office in the morning. He returned you to the hotel and informed you that he would pick you up and take you to see USM Conboy in the morning.

2

In your sworn statement to OII, you reported that you had been suffering from back pain for approximately 10 years and had been given various medications to help alleviate the pain. During this time, the pain medication began to cause problems in your family life and you had tried to stop using this medication on several occasions. You had also contacted the Employee Assistance Program for assistance. At some point, you discontinued the pain medication although you used sleeping pills to permit sleep.

You stated that on February 9, 2005, you did not take any pain medication, but did take some sleep medication known as Ambien. You reported that you had probably taken three Ambien tablets in the morning and three in the afternoon. You later indicated to OII that the physician had prescribed one tablet of Ambien a day.

## CHARGE 1: Driving a GOV while Impaired

**Specification:**   You drove a GOV while impaired on February 9, 2005.

According to sworn statements by witnesses to include DUSM Selb and Loudoun County Police Officer DeLitta, on February 9, 2005, you operated a GOV while in an impaired state resulting in an accident damaging both your GOV and a privately owned truck. By your own admission, you had taken six sleeping pills (Ambien) that day prior to the accident. You acknowledged that your physician had prescribed one tablet of Ambien per day.   You knew or should have known that this excessive amount of medication would impair your ability to drive.

Your actions under this Charge violate the following sections of USMS Directive 2.4, Code of Professional Responsibility, revised October 6, 2003:

Number 6. **Vehicles:** Do not operate a government vehicle in an improper manner or under the influence of intoxicants or drugs.

Number 26. **Personal Activities:** Refrain from any activity that would adversely affect the reputation of the DOJ.

Number 34. **Government Property:** Do not possess or otherwise take government property, and make every effort to secure and use it responsibly.

Your actions under this charge are unacceptable and will not be tolerated. While there is no specific charge in the Table of Offenses and Penalties for driving a GOV while impaired, this charge most closely matches Offense 20 of the USMS Table of Offenses and Penalties which provides a reprimand to removal for the first offense of operating a GOV while under the influence of intoxicants.

## CHARGE 2: Damage to Property

**Specification:**   You damaged government property and/or the property of others when you hit a truck with your GOV.

3

3

A Commonwealth of Virginia, Police Crash Report indicates that you were the driver of a GOV, which hit a privately owned truck causing damage to both vehicles. The estimated cost for repair to the Mr. Driscoll's truck was approximately $4,700. The estimated repair cost for the GOV was approximately $5,900.

Your actions under this charge are unacceptable and will not be tolerated. The DOJ Table of Offenses and Penalties, which is incorporated into the 1996 Master Agreement between the USMS and the American Federation of Government Employees, AFL-CIO, International Council of U.S. Marshals Service Locals, provides at Offense 10, a reprimand to removal for the first offense of unauthorized possession of, use of, loss of, or damage to, government property or property of others, including a U.S. Government owned motor vehicle, aircraft or boat.

Your position as a law enforcement officer requires the highest level of sound judgment, discipline, integrity and professional behavior. Your decision to drive your GOV on February 9, 2005, while impaired, makes me question your suitability for the position of an Inspector with the USMS. Not only did your decision to drive result in an accident which seriously damaged both a government vehicle and the vehicle of a private citizen, you also presented yourself in an impaired condition to a member of the local law enforcement community and to several members of the public. For the above reasons, and for the efficiency of the service, I am proposing that you be removed from your position as DUSM and from the Federal service.

You have the right to respond to this proposal orally, in writing, or both, submitting any affidavits or evidence in support of your reply to Robert J. Finan II, Assistant Director, Investigative Services Division. The documents relied upon in proposing this action are attached. You are entitled to be represented by an attorney or other representative of your choosing. You must designate your representative in writing to Mr. Finan.

Your written and/or oral replies should be completed within 10 calendar days of your receipt of this notice. Consideration will be given to extending this period if you submit a written request stating the reasons for wanting such an extension to Mr. Finan. Full consideration will be given to any reply you submit. In addition, you may receive up to eight hours of administrative leave to prepare your reply. You will be notified promptly in writing, of the decision after consideration of your reply. If no reply is made, a decision will be made at the expiration of the time allowed for your reply.

If you have any questions concerning your procedural rights in this matter, you should contact Ms. Nancy Gunther, Employee Relations Specialist, Human Resources Division, Washington, DC 20530-1000, (202) 307-8516. **In addition, any designation of representative, request for extension, written reply, and/or scheduling of an oral reply should be directed to Mr. Finan, through Ms. Gunther.**

Please sign, date and return the accompanying copy of this memorandum as acknowledgment of receipt of the original and attachments.

Neil DeSousa
Chairperson
United States Marshals Service Discipline Panel

Attachments:  Receipt Acknowledgment Copy
              Off Case File 05-0235

Witnessed by
Julie A. Shealey
SDUSM
02 Feb 06

2-2-06

5

EXHIBIT D

# JOHN BERRY, P.L.L.C.
### ATTORNEYS AT LAW
1990 M STREET, N.W., SUITE 610
WASHINGTON, D.C. 20036
WWW.WORKLAWS.COM

JOHN V. BERRY
ROBERT P. WALDECK
CHERYL POLYDOR
SARA C. VINS*

*ADMITTED ONLY IN VIRGINIA,
PRACTICING IN D.C. PENDING ADMISSION
UNDER SUPERVISION
OF JOHN V. BERRY, ESQ

TELEPHONE: (202) 955-1100
FACSIMILE: (202) 955-1101

<u>VIA FAX AND MAIL</u>

February 24, 2006

U.S. Marshal Robert Finan II
Assistant Director, Investigative Services Division
C/O Nancy Gunther
HRD/ERT
CS-3 Room 233
Washington, DC 20530-1000

> Re:    <u>Written Response to Proposal to Remove Deputy U.S. Marshal Raymond Bonieskie</u>

Dear Mr. Finan:

I am writing to present the Written Response to the U.S. Marshals Service's Proposed Removal of my client, Deputy U.S. Marshal Raymond Bonieskie, for Driving a Government Owned Vehicle While Impaired and Damage to Property. Deputy Marshal Bonieskie takes full responsibility for his actions and regrets the damage he caused to both vehicles. He has recently been authorized to return to full duty and hopes to continue his career with the U.S. Marshals Service.

Mr. Bonieskie asserts that he should not be removed from the federal service because his removal would not promote the efficiency of the service as: (1) his driving of a government vehicle while impaired was the result of a disability involving drug dependency; (2) his impairment was unintentional because he was unaware that he had taken extra Ambien pills that evening due to the effect of the drug; (3) he is fully rehabilitated from his dependency through an

Employee Assistance Program ("EAP")-sponsored treatment program and private medical treatment and to remove him would end the career of a Marshal whose work performance and career to this point has been an asset to the U.S. Marshals Service, and (4) the earliest attempts by Deputy Marshal Bonieskie and his wife to get help from the EAP were ineffective due to poor service from the then-contractor handling intake in the case.

Finally, the proposed penalty of removal should be mitigated because the nature of the offense, Deputy Marshal Bonieskie's prior work record, his potential for rehabilitation, the mitigating circumstances surrounding the offense, the effect of the offense on his supervisor's confidence in his work, and the adequacy and effectiveness of alternative sanctions to deter the conduct in the future all indicate that mitigation of the proposed penalty is proper.

I.    Introduction

    A.    Background

Marshal Raymond Bonieskie joined the U.S. Marshals Service ("Agency") in 1990.   At the time of the incident his duty station was the District of Columbia Superior Court District Office.

On October 31, 1995, Marshal Bonieskie began to suffer the symptoms of a herniated disc.  During the period from 1995 to the present, he suffered from degenerative disc disease and spinal stenosis.  Letter from Dr. Ian M. Wattenmaker, M.D. To Whom It May Concern, (February 23, 2006) (Attachment A).  He was diagnosed with a herniated disc and underwent surgery in February and May of 1996 Id.  Mr. Bonieskie then returned to the hospital for a third back surgery in October of 1999.  Id.

Mr. Bonieskie's back condition was quite painful and he was prescribed opiates from time to time to alleviate the pain.  Interview of Raymond Bonieskie, Tr. at 10.  At first he had no

2

dependency issues with the medication. However, in September of 2004, he felt that the
medication was beginning to affect his personal and family life. Id. Deputy Marshal Bonieskie
decided to seek help. Id. He contacted the Agency's EAP in late September 2004.

Unfortunately, the EAP contractor personnel were less than helpful with Mr. Bonieskie.
Id. The contractor referred Mr. Bonieskie to a physician who appeared more interested in
collecting payment from Mr. Bonieskie rather than treating him. The physician also did not take
Mr. Bonieskie's insurance. Id. Mr. Bonieskie returned to the EAP and indicated to the EAP
contractor that he was not satisfied with the physician's services and was going to take on his
dependency problem alone. The EAP contractor ignored this obvious warning sign and failed to
contact the Agency's EAP staff to inform them of the situation.

In October 2004, Deputy Marshal Bonieskie's wife became concerned about his use of
prescription medication. She contacted the Agency's EAP contractor via their toll-free number.
The contractor apparently did not inform the Agency personnel of her contact.

Mr. Bonieskie stopped taking the pain medication and was making progress on his own
and thought that he was well on his way to handling the problem. Id. However, in November of
2004 he was involved in an incident at Superior Court where a woman who weighed well over
200 pounds attempted to hang herself. Id. He was able to remove the woman from the noose
she had constructed, and save her, but the woman fell back on top of him. Marshal Bonieskie re-
injured his back. Id.

Mr. Bonieskie was taken to the hospital, and was again prescribed opiate pain
medication. Id. at 10-11. He began taking the pain medication as directed. He was also
prescribed Ambien, a prescription hypnotic. Id. After a few weeks, it became apparent to

3

Deputy Marshal Bonieskie that he was again having problems with the pain medication. Id. On

February 6, 2005, he decided to stop taking the pain medication for good. Id.

However, Mr. Bonieskie was unaware that the Ambien sleeping pills were also becoming

a problem for him. Id. at 13. Several times his wife had witnessed him in an extremely drowsy

state taking additional pills and then falling back asleep. Id. at 10-11. On Wednesday, February

9, 2005, his wife asked him to leave the family home until he could appropriately handle the

situation. Id. Apparently, that morning, while in a state of half-sleep or somnolence, he had

again sat up and taken several more Ambien pills before going back to sleep. Id at 13.

Deputy Marshal Bonieskie then decided to check into a hotel. Id. He collected some

things and drove to the Homestead Suites using his assigned Government Owned Vehicle

("GOV"). Proposed Removal at 1. About 2 p.m. he checked into the hotel. Id. The hotel is

located at 45350 Catalina Court in Sterling Virginia. Interview of Deputy T.J. Delitta, Tr. at 3.

Deputy Marshal Bonieskie then decided to go back to sleep. Interview of Raymond

Bonieskie, Tr. at 11. Apparently while asleep, Deputy Marshal Bonieskie again got up and took

additional pills. Id. at 12. Mr. Bonieskie estimated that he had taken at least six Ambien tablets

when he looked at his bottle of pills and saw several more missing than should have been the

case. Id. at 13.

When Mr. Bonieskie woke up again around 7 p.m. that evening, he realized that he had

forgotten to take his equipment belt, and that he did not have enough clothing to continue to

work. Id. at 6. As he drove out of the parking lot, he believed he saw a vehicle coming at him.

Id. Deputy Marshal Bonieskie overcompensated to get out of the way and hit a pickup truck that

was parked parallel to the roadway. Id.

The Loudon County Sheriff's Office was called. Deputy T. J. Delitta arrived on the scene. Interview of Deputy T. J. Delitta, Tr. at 3. Deputy Delitta interviewed Deputy Marshal Bonieskie. Id. Deputy Marshal Bonieskie indicated that he was tired. Id. Deputy Delitta observed some symptoms of intoxication, but also smelled no alcohol on his breath. Id. Deputy Delitta did not administer a breathalyzer. Id. at 10. An alcohol test administered to Deputy Bonieskie the next day indicated that there was no residual alcohol in his system. Interview of Supervisory Deputy U.S. Marshal Thomas Hedgepeth, Tr. at 6.

Deputy Marshal Bonieskie made several telephone calls after the accident, including one to Deputy U.S. Marshal Jean (Chris) Selb. Interview of Raymond Bonieskie, Tr. at 11. He also called Supervisor Marshal Deputy Marshal Thomas Hedgepeth. Interview of Supervisory Deputy U.S. Marshal Thomas Hedgepeth, Tr. at 4. Deputy Marshal Selb arrived on the scene about 25 minutes later. Interview of Deputy U.S. Marshal Jean (Chris) Selb, Tr. at 6. Deputy Marshal Selb did not smell alcohol on Deputy Marshal Bonieskie. Id. at 11. Deputy Marshal Selb took all of Deputy Marshal Bonieskie's weapons from his person and vehicle. Id. at 5. Deputy Marshal Selb then took Deputy Marshal Bonieskie to his home and secured Mr. Bonieskie's personal firearms as well. Id. Selb then returned Mr. Bonieskie to his hotel room. Id.

When Mr. Bonieskie returned to his hotel room, he looked at the bottle of pills and realized he had taken more than the two he thought he had taken. Id. at 12-13. He estimates that he had taken at least six of the pills. Id. at 13. He immediately discarded the remaining Ambien. Id. at 10.

The next day Deputy Marshal Bonieskie contacted the EAP and began the process of recovery. Id. at 25-26. Deputy Marshal Bonieskie entered into an outpatient chemical

5

dependency program at Inova Comprehensive Addiction Treatment Services. Letter from Joe

Wiley, CSAC Addictions Counselor to Judy Sullivan, Employee Medical Programs Office, U.S.

Marshals Service (July 28, 2005) (Attachment B).

Mr. Bonieskie reported maintaining abstinence during the treatment. Id. He completed

the program on November 18, 2005. Letter from Tom Walker, CSAC Addictions Counselor to

Laura Kelso (Nov. 18, 2005) (Attachment C). At the end of his treatment, the program reported

that all urine screens and breathalyzer tests taken by Deputy Marshal Bonieskie were negative.

Id. In addition, supplemental drug tests taken on June 13, 2005, (Laboratory Report of Raymond

Bonieskie, June 13, 2005), (Attachment D), July 7, 2005, (Laboratory Report of Raymond

Bonieskie, July 7, 2005), (Attachment E) and July 26, 2005, (Laboratory Report of Raymond

Bonieskie, July 26, 2005), (Attachment F), taken in conjunction with his treatment by a Dr.

Howard Heit, a pain and addictions specialist, were all negative.

Deputy Marshal Bonieskie was taken off medical leave without pay and cleared to return

to limited duty on September 15, 2005. U.S. Marshals Service Employee Medical Programs

Notice of Medical Status for Raymond Bonieskie, Sept 15, 2005. (Attachment G). On January

30, 2006, Neil DeSousa, Chairperson of the United States Marshals Discipline Panel issued a

Proposed Removal for Deputy Marshal Bonieskie. On February 22, 2006, Deputy Marshal

Bonieskie was authorized to return to full duty. This Written Response followed.

B.    Proceedings

Deputy Marshal Bonieskie was placed in leave without pay status following his accident.

Interview of Deputy U.S. Marshal Raymond Bonieskie, Tr. at 25. On January 30, 2006, Neil

DeSousa, Chairperson of the United States Marshals Discipline Panel issued a Proposed

Removal for Deputy Marshal Bonieskie. Deputy Marshal Bonieskie received the Proposed

6

Removal on February 2, 2006. On February 7, 2006, through counsel, Mr. Bonieskie requested an extension of time to provide a Written Response until February 24, 2005. On February 8, 2005, Agency Employment Specialist Ms. Nancy Gunther informed Mr. Bonieskie's counsel that the extension was granted until Friday, February 24, 2006. This Response followed.

II.   Analysis

Removal of Mr. Bonieskie from his position with the Agency would not promote the efficiency of the service. He drove a government vehicle while impaired because he was suffering from the effects of a disability based on a drug dependency which he has now overcome through structured treatment. Mr. Bonieskie did not intentionally take the number of Ambien pills that he took but was suffering from somnolence, a side effect of the drug which creates a state of near-sleep and intense drowsiness. In this state he took additional pills. Mr. Bonieskie has had a long and productive career with the Agency and to remove him now would deprive the Agency of a good employee and leave his family with serious income problems. Finally, both Mr. Bonieskie, in an early attempt to deal with his dependence on prescription medication, and his wife on another date, contacted the EAP before the accident, but were not well-served by the contractor dealing with initial contacts at the time. Mr. Bonieskie should therefore not be removed from the Agency.

A.   Deputy Marshal Bonieskie Suffered from the Disability of Drug Dependency

Marshal Bonieskie suffered from the disability of drug dependency. He has now fully recovered. The Agency has been right to allow him to go through full treatment and recovery and should now give him the opportunity to return to the federal service now that he is well.

Mr. Bonieskie began suffering from back pain in late 1995. Letter from Dr. Ian M. Wattenmaker, M.D. to Whom It May Concern, (February 23, 2006) (Attachment A). He was

diagnosed with a herniated disc. Id. He underwent surgery in February of 1996. Id. He again underwent surgery in May of 1996. Id. In October of 1999, Mr. Bonieskie returned to the hospital for a third back surgery. Id.

Mr. Bonieskie's back condition was very painful. When the pain became particularly difficult, he would be prescribed opiates from time to time. Interview of Raymond Bonieskie Tr. at 10. At first he had no difficulty with the medication. However, in September of 2004, he felt that the medication was beginning to affect his personal and family life. Id. He decided to seek help. Id. Mr. Bonieskie contacted the Agency's EAP in late September 2004.

Unfortunately, the EAP contractor personnel were less than helpful with Mr. Bonieskie. Id. He was referred to a physician who seemed more interested in collecting payment from Mr. Bonieskie than treating his immediate and pressing symptoms and who did not Mr. Bonieskie's insurance plan. Id. Mr. Bonieskie returned to the EAP and indicated that he was not satisfied with the doctor and was going to take on the problem alone. The contractor should have immediately contacted the Agency's EAP people and informed them of the situation, but did not.

Mr. Bonieskie stopped taking the pain medication and was making progress on his own and thought that he was well on his way to handling the problem. Id. However, in November of 2004 he was involved in an incident at Superior Court where a woman who weighed well over 200 pounds attempted to hang herself. Id. Deputy Marshal Bonieskie was able to remove the woman from the noose she had constructed, but the woman fell back on top of him causing him to re-injure his back. Id.

He was taken to the hospital, where he was again prescribed opiate pain medication. Id. at 10-11. He began taking the pain medication regularly. He was also prescribed Ambien, a prescription hypnotic for insomnia due to pain. Id. After some weeks, it became apparent to

8

Deputy Marshal Bonieskie that he was again having problems with the pain medication. Id. On February 6, 2005, he decided that he was going to stop taking the pain medication for good. Id.

However, Mr. Bonieskie was unaware that the sleeping pills were also becoming a problem for him. On Wednesday February 9, 2005, his wife asked him to leave the family residence until he could deal with the situation. Id. Apparently, that morning, while in a state of half-sleep or somnolence, he had sat up and taken several more Ambien. Id.

Thus, Deputy Marshal Bonieskie was suffering from prescription drug dependency at the time of the accident, and the effects of that disability caused him to be unaware that he had taken far more Ambien than he had thought. He asks that the effects of this dependency be taken into account when the Agency decides upon a penalty in this case.

It has been the general policy of the Federal government to provide rehabilitation in cases of a disability based on drug dependence. E.O. 12564 (Sept. 15, 1986).

B. **Deputy Marshal Bonieskie Did Not Intentionally Operate the Vehicle While Impaired**

Deputy Marshal Bonieskie did not intentionally operate the GOV while impaired. Because of the likely onset of somnolence, a common side effect of Ambien, he was unaware of the number of Ambien he had taken on the date of the incident. Thus, his intoxication from Ambien was involuntary and he did not intend to operate the vehicle in an impaired state.

According to Deputy Marshal Bonieskie, his wife had witnessed him in an extremely drowsy state taking additional pills and then falling back asleep. Id. at 10-11. On Wednesday February 9, 2005, his wife again witnessed him sit up while appearing to be asleep and take several more Ambien before going back to sleep. Id. at 11.

Somnolence is a state of near-sleep or drowsiness. According to a common drug database, fifteen percent (15%) of persons taking the drug in a recent study reported somnolence

9

as a side effect of Ambien. Drugdex Evaluation of Zolpidem (Ambien) at 9-10 (Attachment H).

Somnolence is "one of the most frequently reported side effects" of Ambien. Id. It appears that

Deputy Marshal Bonieskie took more than the recommended amount, making it more likely that

he was suffering from a side effect that fifteen percent (15%) of the people who took the drug at

the recommended dose experience.

If Deputy Marshal Bonieskie had fully understood that he was taking more than the

recommended dosage of Ambien he would have not operated his GOV. He asks that your

decision so reflect these facts.

C.     Deputy Marshal Bonieskie Has Successfully Completed Rehabilitation

After the accident, Deputy Marshal Bonieskie entered into an outpatient chemical

dependency program at Inova Comprehensive Addiction Treatment Services. Letter from Joe

Wiley, CSAC Addictions Counselor to Judy Sullivan, Employee Medical Programs Office, U.S.

Marshals Service (July 28, 2005) (Attachment B). During the program Mr. Bonieskie reported

maintaining abstinence. Id. He completed the program on November 18, 2005. Letter from

Tom Walker, CSAC Addictions Counselor to Laura Kelso (Nov. 18, 2005) (Attachment C). At

the end of his treatment, the program reported that all urine screens and breathalyzer tests taken

by Deputy Marshal Bonieskie were negative. Id. In addition, supplemental drug tests taken on

June 13, 2005, (Laboratory Report of Raymond Bonieskie, June 13, 2005), (Attachment D), July

7, 2005, (Laboratory Report of Raymond Bonieskie, July 7, 2005), (Attachment E) and July 26,

2005, (Laboratory Report of Raymond Bonieskie, July 26, 2005), (Attachment F), in conjunction

with his treatment by Dr. Howard Heit, a pain and addictions specialist, were all negative.

Deputy Marshal Bonieskie was taken off medical leave without pay and cleared to return

to limited duty on September 15, 2005. U.S. Marshals Service Employee Medical Programs

Notice of Medical Status for Raymond Bonieskie, Sept. 15, 2005. (Attachment G). On

February 22, 2006, Deputy Marshal Bonieskie was authorized to return to full duty.

Deputy Marshal Bonieskie has provided the Agency with solid service for the last fifteen

years. To remove him would not serve the efficiency of the federal service, as his recovery has

shown that he has many more years to contribute to the Agency.

D.    Officer Bonieskie and his Wife Separately Contacted EAP but Received Less
       Than Satisfactory Assistance

In September of 2004, Deputy Marshal Bonieskie felt that the prescription medication for

pain that he was taking was beginning to affect his personal and family life. Id. He decided to

seek help. Id. Mr. Bonieskie contacted the Agency's EAP in late September 2004.

Unfortunately, the EAP contractor personnel were less than helpful with Mr. Bonieskie.

Id. The contractor referred Mr. Bonieskie to a physician who seemed to be more interested in

collecting payment from Mr. Bonieskie than treating him and who offered very little guidance in

the first session. Mr. Bonieskie returned to the EAP and indicated to the EAP contractor that he

was not satisfied with the doctor and was going to take on his dependency problem alone. The

EAP contractor ignored this important warning sign and failed to contact the Agency's EAP

personnel to inform them of the situation.

In October of 2004, Deputy Marshal Bonieskie's wife became concerned about his use of

prescription medication. She contacted the Agency's EAP contractor via the toll-free telephone

number provided for Agency personnel. The contractor apparently did not inform the Agency

personnel of her contact.

The Agency should have been informed of these contacts. Both Deputy Marshal

Bonieskie and his wife reached out for assistance, but the EAP contractor did not provide the

type of service which they needed. It is Mr. Bonieskie's understanding that the contractor at the

11

time had not performed well in fulfilling its duties. Deputy Marshal Bonieskie asks that you take his earlier attempts to get assistance and the failure of the EAP contractor to fully assist him into consideration when evaluating the proposed discipline in this case.

III.   Penalty Analysis and Mitigation

Deputy Marshal Bonieskie feels that the proposed penalty of removal should be mitigated because his prior work record, the continued confidence of his supervisors despite the incident, his potential for rehabilitation, the mitigating circumstances surrounding the offense, and the adequacy and effectiveness of alternative sanctions to deter the conduct in the future all bear directly on the penalty and indicate that mitigation is proper. A lesser penalty of a suspension would be more appropriate given the facts of the case.

A.   Douglas Factors: Several Douglas Factors Indicate Mitigation Is Proper

The proposed penalty is excessive in this case and should be mitigated in the final decision. If a penalty is found by the Merit Systems Protection Board ("M.S.P.B.") to be "disproportionate to an offense or otherwise improper," it will be found to be an abuse of discretion, warranting reversal. Douglas v. Veterans Administration, 5 M.S.P.R. 280, 285 (1981). The burden to show the appropriateness of the penalty is on the Agency. Id. at 307.

The M.S.P.B. held in Douglas that twelve factors should be considered when evaluating proposed disciplinary penalties. Id. Here, the most relevant factors involve Deputy Marshal Bonieskie's work performance, the effect of the offense on his supervisor's confidence in his ability to perform, his potential for rehabilitation, mitigating factors surrounding the offense, and the effectiveness of a lesser sanction. Other Douglas factors are also relevant, but the most important ones presently are the ones included in this Written Response. When these factors are taken into account, the proposed penalty should be mitigated to a lesser sanction.

1.    Deputy Marshal Bonieskie's Work Performance, Length of Service and
        Dependability Indicates Mitigation Is Proper

In evaluating a disciplinary case, an employee's length of service and prior work record

will be balanced against the seriousness of the offense. Miguel v. Dep't of Army, 727 F.2d

1081, 1084 (Fed. Cir. 1984). Deputy Marshal Bonieskie has been with the Agency for nearly

sixteen years and has served with distinction. In addition, Deputy Bonieskie has a solid

performance record. He requests that you consider his successful past performance and

commendations both before and after this incident, in making your decision on the Proposed

Removal.

2.    Deputy Marshal Bonieskie's Supervisors Have Confidence In His Ability
        to Perform

Deputy Marshal Bonieskie's performance during the six months (post-incident) in which

he has been working has been productive, as noted above. He has been working continuously

since September of 2005 and has worked productively since under his supervisors. He has been

cleared for full duty as of February 22, 2006. Therefore, this should be taken into consideration

as a mitigating factor into any penalty consideration. See Schoeffler v. Dep't of Agriculture, 47

M.S.P.R. 80, 89 (1991) (falsification demotion action mitigated to 60-day suspension where

agency did not propose discipline until 11 months after it had learned of the incident and

appellant's recent performance had been good).

Deputy Marshal Bonieskie asks that you also consider that the Agency (and his

supervisors) never lost confidence in his abilities and returned him to full duty on February 22,

2006, in mitigating any penalty issued in this case.

3.    Deputy Marshal Bonieskie Has Demonstrated Great Potential for
        Rehabilitation

Deputy Marshal Bonieskie has also exhibited significant potential for rehabilitation in this case. An underlying principle of progressive discipline is that by disciplining an employee with increasing degrees of punishment that the employee is given an opportunity to learn from his or her mistakes. Fowler v. United States Postal Service, 77 M.S.P.R. 8, 14 (1997).

In other words, rehabilitation or its potential is one factor to be considered in the possible mitigation of penalties. Rehabilitation may be shown by an employee with prior performance and continued, dependable job performance. Lewis v. Dep't of Air Force, 28 M.S.P.R. 483, 487 (1985). Therefore, the discipline that is issued in this case should be mitigated accordingly.

After the accident, Deputy Marshal Bonieskie entered an outpatient chemical dependency program at Inova Comprehensive Addiction Treatment Services. Letter from Joe Wiley, CSAC Addictions Counselor to Judy Sullivan, Employee Medical Programs Office, U.S. Marshals Service (July 28, 2005) (Attachment B). As noted earlier, during the program Mr. Bonieskie reported maintaining abstinence. Id. He completed the program on November 18, 2005. Letter from Tom Walker, CSAC Addictions Counselor to Laura Kelso (Nov. 18, 2005) (Attachment C). The program reported that all urine screens and breathalyzer tests taken by Deputy Marshal Bonieskie were negative. Id. Supplemental drug tests taken on June 13, 2005, (Laboratory Report of Raymond Bonieskie, June 13, 2005), (Attachment D), July 7, 2005, (Laboratory Report of Raymond Bonieskie, July 7, 2005), (Attachment E) and July 26, 2005, (Laboratory Report of Raymond Bonieskie, July 26, 2005), (Attachment F), were all negative.

Deputy Marshal Bonieskie's dedication to rehabilitation has resulted in his recovery from the effects of prescription drug dependency. He has demonstrated that he still has much to offer the Agency by his dedication to his recovery. He asks that you take his rehabilitation into account when reviewing the penalty in this case.

14

4.    Substantial Mitigating Circumstances Existed

Any unique circumstances surrounding an offense can also serve to mitigate the penalty against Deputy Marshal Bonieskie. Douglas, 5 M.S.P.R. at 305-06. Unique circumstances can include unusual job tensions, personality problems, mental impairment, harassment or bad faith, malice or provocation on the part of others involved in the matter and personal problems taking place in the employee's life which are unrelated to the job. Id.; See Also Crouse v. Dep't of the Treasury, 70 M.S.P.R. 623, 630 (1996).

Here, the back injuries suffered by Deputy Marshal Bonieskie constitute just such circumstances. One such injury occurred when he was saving the life of a prisoner who tried to commit suicide. Interview of Deputy U.S. Marshal Raymond Bonieskie, Tr. at 10. His pain required treatment which resulted in his dependency on the very medications which were supposed to help him. Had he not had the back injury, there would have been no need for strong painkillers and he would have never had the accident in the first place. Indeed, without the effects of the dependency, he would not have left his home on February 9, 2003 and would have not been driving his GOV.

5.    An Alternative, Lesser Sanction Would be Adequate

An agency must give "substantive consideration to a lesser penalty." Banez v. Department of Defense, 69 M.S.P.R. 642, 649 (1996). Here, the Agency suggests only that Deputy Marshal Bonieskie be removed from his position in the proposed action. A lesser sanction would be adequate, as Deputy Marshal Bonieskie has committed fully to recovery, and his time on medical leave without pay and his desire to change his life has been more than enough to motivate him to avoid similar misconduct in the future. He therefore asks that you consider a lesser penalty.

Deputy Marshal Bonieskie feels that the proposed penalty of removal should be mitigated because of his prior work record, his potential for rehabilitation, the mitigating circumstances surrounding the offense, and the adequacy and effectiveness of alternative sanctions to in this case. A lesser penalty of a suspension would be more appropriate given the facts of the case.

IV.    Conclusion

Deputy Marshal Bonieskie takes full responsibility for all of his actions; he has done so throughout the lengthy investigative process. However, he respectfully asks that he not be removed as proposed. Deputy Marshal Bonieskie looks forward to continuing his productive career in with the Agency.

Deputy Marshal Bonieskie asks that he not be removed from the federal service because his removal would not promote the efficiency of the service as: (1) his driving of a government vehicle while impaired was the result of a disability of drug dependency; (2) his impairment was unintentional because he was unaware that he had taken extra Ambien pills that evening due to the effect of the drug; (3) he is fully rehabilitated from his dependency through an EAP-sponsored treatment program and to remove him would end the career of a Marshal whose work performance and career to this point has been an asset to the U.S. Marshals Service, and (4) the earliest attempts by himself and his wife to get help from the Employee Assistance Program were thwarted due to poor service from the then-contractor handling intake in the case.

Deputy Marshal Bonieskie also asks that the proposed penalty of removal be mitigated because his prior work record, his potential for rehabilitation, the mitigating circumstances surrounding the offense, the effect of the offense on his supervisor's confidence in his work, and the adequacy and effectiveness of alternative sanctions to deter the conduct in the future all indicate that a penalty less than removal is proper. Deputy Marshal Bonieskie truly enjoys his

16

job as a Deputy United States Marshal and seeks to continue to contribute to the Agency's

mission as he has for the last fifteen years.

Please consider this written response in making your decision. Thank you again for your

time and consideration in this matter.  Please let me know if you have any questions in this

matter.  I can be reached directly at (202) 955-1100.


                                    Sincerely,


                                    Robert P. Waldeck, Esq.
                                    JOHN BERRY, P.L.L.C.
                                    Attorneys at Law
                                    1990 M Street NW Suite 610
                                    Washington, D.C. 20036
                                    (202) 955-1100


Enclosures (8)

cc: File
    Raymond Bonieskie

17

EXHIBIT E

UNITED STATES GOVERNMENT

# memorandum

DATE:          March 28, 2006

REPLY TO
ATTN OF:    MAY-ERT-2005-0201-SC/DC-NBU-NG

SUBJECT:    Decision on Proposed Removal

TO:            Raymond Bonieskie
               Deputy United States Marshal
               District of Columbia Superior Court

    After careful consideration of the entire record in this case, I find that the charges Driving a Government Owned Vehicle (GOV) While Impaired and Damage to Property to be sustained by the preponderance of the evidence. For the reasons discussed below and for the efficiency of the service, I have decided to mitigate the proposed removal to demotion from your position as a Deputy U.S. Marshal (DUSM), GS-1811-12/3 to a DUSM, GS-0082-11/5, effective April 2, 2006, and to suspend you for 30 days.

    The suspension will be effective from May 1, 2006 through May 30, 2006. You will return to duty on May 31, 2006.

    By memorandum dated January 30, 2006, which you received on February 2, 2006, Neil DeSousa, Chairperson, U.S. Marshals Service (USMS) Discipline Panel, proposed to remove you based on the charges described above. You may refer to your copy of the proposal letter for more specific information.

    In the proposal, you were given the opportunity to respond to this proposal and to submit any affidavits or evidence in support of your reply. You indicated that you would be represented by Robert Waldeck.

    On February 9, 2006, you requested Alternative Dispute Resolution (ADR) to resolve the issues of the proposed removal. You were notified on February 10, 2006, that pre-decisional ADR was not available in cases appealable to the Merit Systems Protection Board (MSPB).

    On February 24, 2006, Mr. Waldeck submitted a written response on your behalf. You and your representative presented your oral response to me on March 3, 2006.

/

During the oral response you accepted full responsibility for what had occurred. You reviewed the history of your back pain which began from a herniated disc, aggravated by surgeries, an accident, and by degenerative bone disease and spinal stenosis. You recounted your use of prescription medications for pain and for sleeplessness. You reviewed your actions in identifying your need for outside assistance and for seeking help from the Employee Assistance Program (EAP). You reported that following the accident you had lived apart from your family for an extended period while you participated in an outpatient chemical dependency program at Inova Comprehensive Addiction Treatment Services. You acknowledged that you had been dependent on prescription drugs but stated that this period was brief, all medications were prescribed, and no laws had been broken. You stated that now you were ready and eager to return to full duties.

You affirmed that you are now back to full duty as a DUSM. You reported that your life has returned to normal and your family trusts you to stay off drugs. You are currently participating in AA/NA meetings on a regular basis, taking appropriate medication, and following the strict guidance of your personal physician.

In making a decision in this matter, I have considered all relevant information in this matter, to include your oral and written responses. It is my decision that all charges are sustained.

Your law enforcement position requires the highest level of sound judgment, discipline, integrity, public trust, and professional behavior. You demonstrated a lack of judgment by your actions in driving your GOV, which had the potential for a much more serious outcome. Your actions also were the source of embarrassment for the Marshals Service in dealing with the local law enforcement agency that responded to your accident.

In deciding the appropriate penalty for these charges, I have considered the relevant factors enumerated in Douglas v. Veterans Administration, 5 MSPB 313 (1981), to include your assumption of responsibility for your actions and your determination to overcome the addiction issues and return to a full duty status. These efforts were aided by the sacrifices made by your family. For these reasons, I have decided to mitigate the removal to a demotion, which will enable you to continue your law enforcement career. In addition, I must impose a 30 day suspension for your misuse of your GOV.

You have the right either to appeal this decision to the Merit Systems Protection Board (MSPB) or to file a discrimination complaint through the Department of Justice Discrimination Complaint System. You may choose only one of these courses of action.

If you decide to appeal to the MSPB, you must do so within 30 calendar days of the effective date of this decision. Your appeal must be filed with the U.S. Merit Systems Protection Board, Washington DC Regional Office, Regional Director and Chief Administrative Judge, 1800 Diagonal Road, Suite 205, Alexandria, VA 22314-2840.

The telephone number is (703) 756-6250; the FAX number is (703) 756-7112; the e-mail address is washingtonregion@mspb.gov. The MSPB website, www.mspb.gov has information on filing your MSPB appeal electronically. An MSPB appeal form and a copy of the MSPB rules and regulations are attached. The 30-day time limit for filing an appeal with the MSPB will be automatically extended to 60 days if you and an official of the USMS Alternative Dispute Resolution (ADR) Program have mutually agreed in writing, within the initial 30-day time limit for filing an MSPB appeal, to attempt to settle this matter through the ADR process. The ADR process is set forth in the ADR Handbook, USMS Publication Number 95. If you have any questions regarding the ADR process, please contact Mr. Harry Mays, Human Resources Division, at (202) 307-9627.

If you believe this action is being taken because of your race, color, religion, sex, sexual orientation, parental status, national origin, age, physical or mental disability, or in retaliation for participating in activity protected under civil rights statutes, you may request a review of this action through the Department of Justice (DOJ) Discrimination Complaint System (see DOJ Order 1200.1). To file a discrimination complaint, you should notify the USMS Office of Equal Employment Opportunity at (202) 307-9048 within 45 days of the effective date of this action, regardless of whether you also pursue Alternative Dispute Resolution or some other forum.

If you have any questions regarding your procedural rights in this matter, you may contact Nancy Gunther, Employee Relations Branch, Human Resources Division, at (202) 307-8516.

Please sign, date, and return the accompanying copy of this memorandum as acknowledgment of receipt of the original and the attachments.

Robert J. Finan II
Assistant Director
Investigative Services Division

3-29-06

Attachments:   Acknowledgment copy of memorandum
                MSPB Appeal Form
                MSPB Rules and Regulations

3

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAYMOND BONIESKIE,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0666 (PLF)** |
| ) | |
| **v.** ) | |
| ) | |
| **ALBERTO GONZALES,** ) | |
| **Attorney General, United States** ) | |
| **Department of Justice,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 56.1 and 7(h), Defendant, Alberto Gonzales, Attorney General, United States Department of Justice, respectfully submits this statement of material facts as to which there is no genuine issue in support of his Motion for Summary Judgment.

1.    Plaintiff Raymond L. Bonieskie is employed as a Deputy United States Marshal. Plaintiff has been employed with the U.S. Marshals Service (the "Agency") since August 20, 1990, and as a Deputy United States Marshal since August 4, 1998.  Compl. ¶¶ 5, 12.

2.    For intermittent periods of time since May 1999, Plaintiff contends he has suffered from drug dependency and chronic pain.  Id. ¶ 13.

3.    In the 1990's Plaintiff began suffering from a herniated disk and lumbar spinal stenosis.  Id. ¶ 18.  In February and May 1996 and again in May 1999, Plaintiff had lumbar spine operations to relieve lumbar nerve root compression.  Id.   These disorders caused Plaintiff nerve pain.  Id.

4.    After his back surgeries, Plaintiff received an accommodation by being placed on

light duty while he recovered from each of his surgeries.  Exhibit ("Ex.") A, excerpts from the deposition of Raymond Bonieskie dated June 21, 2006 ("Bonieskie Dep.") at 20-21, 34-35.

5.      Plaintiff never informed any Agency official or employee that he was unable to complete the physical requirements of the job, and in fact, was able to perform his job duties on a regular basis.  Id. at 53-54.

6.      In the summer of 2004, Plaintiff alleges that he began abusing Percocet, a prescription medication he was given to control the pain associated with disk herniation and lumbar spinal stenosis, by consuming the drug in excess of the prescribed amounts on a regular basis.  Compl. ¶¶ 18, 20.  According to Plaintiff, in June 2004, he suffered memory lapses and blackouts, which he attributed to his excessive use of prescription drugs.  Id. ¶ 21.

7.      Around this same time, Plaintiff was prescribed Ambien, a sleep aid, which, in addition to the Percocet, he contends he began to take regularly.  Id. ¶ 22.

8.      In late September 2004, Plaintiff contacted the Agency's Employee Assistance Program ("EAP"), after he had stopped taking the Percocet.  Id. ¶ 23.  Plaintiff spoke with Mr. Tom Madden, a counselor employed by the Agency's contractor, to request a recommendation for a drug treatment program.  Id.  Plaintiff contacted the recommended program but he felt that the counselor he spoke with was not sufficiently interested in Plaintiff's problem.  Id.  Plaintiff again contacted Mr. Madden, however, according to Plaintiff, Mr. Madden was not responsive to Plaintiff's concerns.  Id.  According to Plaintiff, he informed Mr. Madden that he was going to try to abstain from taking Percocet on his own.  Id.  According to Plaintiff, Mr. Madden did not discuss recovery or recommend another program for Plaintiff.  Id.

9.      Plaintiff, who was formerly employed as an Employee Relations Assistant with

2

the Agency, was aware that his contact with the EAP was confidential and that no one in the Agency would know that he contacted EAP. Ex. A, at 8-9.

10.     None of Plaintiff's supervisors were aware that Plaintiff was misusing prescription drugs. Nor did Plaintiff notify any Agency official, supervisor or employee that he was misusing prescription drugs, or that he had an alleged drug dependency. Id. at 65-66, 73-76, 90, 99, 173.

11.     In November 2004, Plaintiff re-injured his back when attempting to assist in lifting a prisoner. Compl. ¶ 24. As a result, Plaintiff contends that he was prescribed Percocet again. Id. ¶ 25. According to Plaintiff, he had become addicted to Percocet as well as Ambien. Id. ¶ 26.

12.     As a result of his alleged prescription drug abuse, Plaintiff contends that, at nighttime, he would sleepwalk around the house; make meals, often leaving the stove on; and would argue with his wife but have no memory of these events in the morning. Id.

13.     Plaintiff testified that other effects of his drug dependency included being irritable, not being able to control his prescription drug dosages, and getting up in the middle of the night. Ex. A, at 65.

14.     Plaintiff testified that his personal appearance at work also began to suffer as a result of his prescription drug abuse because he was only taking one or two showers a week. Id. at 72-73. However, Plaintiff was working in the field doing interviews and thus his supervisors did not see him on a daily basis. Id. at 73.

15.     According to Plaintiff, on the morning of February 9, 2005, Plaintiff called his office and reported he was sick, took an Ambien, and went back to sleep. Id. at 127-29. Later

3

that morning, Plaintiff alleges that his wife asked him to leave the home because of bizarre behavior he had exhibited.  Id. at 129; Compl. ¶ 29.  Plaintiff contends that he packed some of his belongings and checked into a hotel.  Compl. ¶ 29.  Plaintiff also contends that he took another Ambien and went to bed.  Id.

16.    Plaintiff next contends that he awoke a few hours later, still half-asleep and under the effects of the Ambien.  Id. ¶ 30.  He alleges that he put on two coats, entered his government owned vehicle ("GOV") with the intent of driving home to retrieve more of his belongings, and, then drove approximately 75 to 100 feet in the parking lot.  Id.  Plaintiff then crashed his GOV into the back of a pickup truck in the parking lot of the hotel.  Id.  See also Ex. B, Affidavit Regarding Loss or Damage to Government Property.

17.    As a result of his misconduct and the circumstances surrounding the above described accident, the Agency issued a proposal to remove Plaintiff from his position.  Ex. C, Memorandum dated January 20, 2006 regarding proposed removal.  Plaintiff was charged with "Driving a GOV while Impaired" and "Damage to Property."  Id. at 3.

18.    Through his attorney, Plaintiff submitted a written response to the proposal to remove him in which he accepted full responsibility for his actions.  Ex. D, Letter to U.S. Marshal Robert Finan II dated February 24, 2006, at 1.  Plaintiff contended that his driving of his government vehicle while impaired was a result of a disability involving drug dependency.  Id.  Plaintiff further alleged that since the accident he had undergone rehabilitation through an EAP sponsored treatment program.  Id. at 1-2.

19.    After consideration of Plaintiff's written response to the proposal to terminate him, the Agency's deciding official mitigated Plaintiff's proposed removal to a demotion from a

4

Deputy U.S. Marshal ("DUSM") GS-1811-12/3 to a GS-0082-11/5 effective April 2, 2006.  Ex.

E, Memorandum dated March 28, 2006.  Plaintiff was also suspended for a period of thirty days,

from May 1, 2006, through May 30, 2006.  Id.

      20.     At no time did Plaintiff ever request an accommodation from any Agency official

or representative for his alleged dependency on prescription drugs.  Ex. A, at 55.

Dated: July 30, 2007

                            Respectfully submitted,

                              /s/ Jeffrey A. Taylor
                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                          United States Attorney

                              /s/ Rudolph Contreras
                          RUDOLPH CONTRERAS, D.C. BAR #  434122
                          Assistant United States Attorney

                              /s/ Michelle N. Johnson
                          MICHELLE N. JOHNSON, D.C. BAR # 491910
                          Assistant United States Attorney
                          United States Attorney's Office
                          Civil Division
                          555 4th Street, N.W. – Room E4212
                          Washington, D.C. 20530
                          (202) 514-7139

                          COUNSEL FOR DEFENDANT

**Of Counsel:**

Lucille C. Roberts
Deputy General Counsel
United States Marshals Service Headquarters
Office of General Counsel
Building CS-3, 12th Floor
Washington, DC 20530-1000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **RAYMOND BONIESKIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.: 07-0666 (PLF)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALBERTO GONZALES,** | ) | |
| **Attorney General, United States** | ) | |
| **Department of Justice,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

This matter having come before the Court on Defendant's for Summary Judgment, it is

hereby

**ORDERED** that Defendant's Motion for Summary Judgment is hereby **GRANTED**.   It

is further

**ORDERED** that the complaint is dismissed with prejudice.

**SO ORDERED** on this _____ day of _____, 200___.

_____
UNITED STATES DISTRICT JUDGE