### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAYMOND BONIESKIE,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0666 (PLF)** |
| ) | |
| **v.** ) | |
| ) | |
| **ALBERTO GONZALES,** ) | |
| **Attorney General, United States** ) | |
| **Department of Justice,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

### DEFENDANT'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Alberto Gonzales, Attorney General, United States Department of Justice, respectfully submits his reply brief in further support of his motion to dismiss, or alternatively, for summary judgment. While plaintiff's opposition to defendant's motion attempts to manufacture a material issue of fact, in reality, plaintiff himself has further strengthened defendant's arguments in support of dismissal, or alternatively, summary judgment. Plaintiff's own arguments and testimony reveal that he is not, and was not, disabled within the meaning of the Rehabilitation Act; that his supervisors were never aware of any alleged disability that he claims to have suffered; and that he never requested any reasonable accommodation. For these reasons, as initially contended in defendant's motion for dismissal, or alternatively, summary judgment, defendant is entitled to dismissal of the complaint or, alternatively, judgment as a matter of law.

**ARGUMENT**

I.     **Plaintiff Was Not Substantially Limited in the Performance of Any Major Life Activities.**

In his opposition to defendant's motion, plaintiff contends that his bare assertion in his complaint that his alleged disability, which he contends consisted of chronic disabling back pain and drug dependency to prescription medication, "limited his ability to engage in certain major life activities . . . ." is sufficient to ward off dismissal or summary judgment in this case. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Dismissal, or, in the Alternative, for Summary Judgment ("Pl.'s Opp'n") at 9 (quoting Compl. ¶¶ 13-14). Although absent from his complaint, in his opposition to defendant's motion,[1] plaintiff specifically contends that his alleged disability has placed "substantial limitations" on his ability to perform the major life activities of "working, thinking, sleeping, caring for himself, and interacting with others." Pl.'s Opp'n at 10. Assuming these activities qualify as "major life activities," plaintiff has failed to show that he was substantially limited in any of them. To support his contention that he was substantially limited in the activities of working, thinking, sleeping, caring for himself and interacting with others, plaintiff apparently cites to his

--------

[1] Plaintiff contends that his complaint and his testimony before the Merit Systems Protection Board ("MSPB") "detail the substantial limitations his disability has placed on his ability to perform the major life activities of working, thinking, sleeping, caring for himself, and interacting with others." Pl.'s Opp'n at 10. Plaintiff's complaint, however, is void of such specific allegations. Nor has plaintiff placed his MSPB testimony before the Court. As plaintiff is aware, on a motion for summary judgment, plaintiff, as the non-movant, is not at liberty to rest upon mere allegations or denials, but must come forward with evidence establishing a material issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Furthermore, plaintiff's statement of genuine issues, attached as Exhibit B to plaintiff's opposition, fails to "include references to the parts of the record relied on to support the statement[s]." LCvR 7.1(h); LCvR 56.1. Plaintiff has quite simply failed to carry his burden in opposing defendant's motion for summary judgment.

deposition testimony.  Id. (citing plaintiff's deposition testimony, at 65-74).[2]  However, even a superficial reading of the testimony identified by plaintiff, attached hereto as Exhibit 1, further supports the conclusion that plaintiff was not disabled in any of these alleged "major life activities."  In these pages from his deposition, plaintiff testified that during the period of late spring, early summer 2005, he had to fly to California where his wife and children had been involved in a car accident and had to return them home, and subsequently drove "all the way back down to North Carolina with a truck" to retrieve things to put in storage.  Ex. 1, at 66-67. Plaintiff stated he took two to three weeks off from work during this time, and at the end of July, he and his family "went down to Disney World for two weeks, so probably that five to six week period, I probably only worked about a week and a half to two weeks."  Id. at 70.  So, not only was plaintiff responsible for the care of his family after their accident, he in fact took "two to three weeks" off from work and traveled to Disney World.  Id.  at 67, 70.  These actions hardly sound typical of someone who was *substantially* limited in the major life activities of working, thinking, sleeping, caring for himself, and interacting with others.

Plaintiff also contends that he "experienced substantial limitations in the major life activit[y] of . . . caring for his personal hygiene."  Pl.'s Opp'n at 11 (citing Compl. ¶¶ 21, 26-27). Again, assuming this qualifies as a major life activity, plaintiff's citations to his complaint and deposition testimony do not support this allegation.  Rather, paragraph 21 of the complaint

---

[2]Plaintiff cites to "Plaintiff's Exhibit A, pp. 65-74," however, Exhibit A of plaintiff's opposition is his response to defendant's statement of material facts as to which there is no genuine issue.  Plaintiff is probably referring to Exhibit A of defendant's motion, which consisted of excerpts from plaintiff's deposition testimony.  However, not all of the pages cited by plaintiff were actually attached to defendant's exhibit.  Therefore, defendant has attached additional pages from plaintiff's deposition testimony as Exhibit 1 to this reply.

alleges that plaintiff "began exhibiting pronounced symptoms at work, including memory lapses and blackouts. Plaintiff also exhibited problems at home, for example, coming home from work, avoiding all contact with his family and taking his meals in bed." Compl. ¶ 21. Paragraph 21 does not, however, indicate that plaintiff was having any difficulties "caring for his personal hygiene." Paragraphs 26 and 27 further fail to support this contention. Id. ¶ 26 (noting that plaintiff would get out of bed at night, "still sound asleep, and walk around the house. He would make entire meals, and often leave the stove on. Plaintiff gained 20 or 30 pounds during this period."); id. ¶ 27 (contending that plaintiff decided to stop taking Percocet completely, and began suffering withdrawal and increased pain, which made "sleep difficult . . . .").

　　None of the cases cited by plaintiff support his contention that he was substantially limited in the major life activities of sleeping, thinking, and caring for his personal hygiene. In EEOC v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001), the court found that the employee, who suffered from a form of epilepsy, was not substantially limited in the major life activities of sleeping, thinking, and caring for herself. As it concerned sleeping, the court noted that the EEOC "failed to prove that [plaintiff's] lack of sleep was worse than the quality of sleep of the general population[,]" a requirement found in the EEOC's own regulations. Id. (citing 29 C.F.R. § 1630.2(j)(2)). Second, the plaintiff was not substantially limited in her ability to think despite the fact that, on one occasion, she forgot the location of her doctor's office, and forgot things two or three times a week and had to write things down to remember them. Id. at 353. These "limited examples," the court held, did not demonstrate a substantial limitation on the plaintiff's ability to think. Finally, the plaintiff was not substantially limited in her ability to care for herself because the evidence showed she was able to care for her son, drive a car, and performed

4

her job effectively.  Id. at 353.  The plaintiff here is similar to the plaintiff in EEOC because, he too, has proffered no evidence that his alleged impairment substantially limited him in the major life activities of sleeping, thinking, and caring for himself, as compared with the general population.  While plaintiff did testify that he took less showers and forgot things on occasion, Ex. A, at 72, he does not provide any evidence that he was "substantially limited" in these activities.

Plaintiff also cites to Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1134 (9th Cir. 2001).  While the Humphrey court did find that the employee was substantially limited in the major life activity of caring for herself, the facts are distinguishable from this case.  In Humphrey, the employee was diagnosed as having obsessive compulsive disorder ("OCD") and it took her "significantly more time than the average person to accomplish the basic tasks of washing and dressing."  Id. at 1134-35.  Specifically, the plaintiff testified that as a result of her OCD, "the process of washing and brushing her hair alone could take several hours, and she at times would prepare for work from eight o'clock in the morning until five or six o'clock in the evening."  Id. at 1135.  Plaintiff in this case has not demonstrated that he suffered similar substantial limitations in his ability to care for himself as compared with the plaintiff in Humphrey.

Plaintiff also alleges that his "difficulties with his wife and children[,]" support a finding that he was significantly limited in the major life activity of "interacting with others."  Pl.'s Opp'n at 11.  In support of this proposition, plaintiff cites McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999).  However, this case is clearly distinguishable from the present circumstances.  While the McAlindin court concluded that interacting with others is a

major life activity under the Americans with Disabilities Act ("ADA"), the plaintiff in that case was found to be substantially limited in this major life activity because he suffered "from a total inability to communicate at times, in addition to a more subtle impairment in engaging in meaningful discussion." Id. at 1235 (emphasis added). There is absolutely no evidence that plaintiff in this case was ever totally unable to communicate with his family or other persons. In fact, plaintiff testified that during the time he was allegedly disabled, he went with his family on a trip to Disney World. Ex. 1, at 70.

Finally, plaintiff contends that he was limited in the major life activity of working because, as asserted in his complaint, he "experienced 'memory loss' and 'blackouts' at work as a result of his disability. Pl.'s Opp'n at 12 (quoting Compl. ¶ 21). According to plaintiff, "[t]hese symptoms clearly represent a substantial limitation in his work as a sworn law enforcement officer required to carry a firearm. Memory loss and blackouts also would substantially limit [p]laintiff's ability to perform a wide range of other jobs." Pl.'s Opp'n at 12. Plaintiff's argument on this point is belied by his testimony that, aside from being placed on light duty as a result of his back surgeries, he has at all relevant times been able to perform the duties of his position. Compl. ¶ 12 (noting that plaintiff has been employed for 16 years). Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mot."), Ex. A, at 53 (plaintiff testified that during 2002 to 2004 he was required to take physical fitness tests and would "gut it out" and never asked for any waiver from any physical requirements); id. at 54 (testifying that he never asked to be excused from qualifying at the shooting range); id. (testifying that he never brought in a doctor's note asking to be excused from any type of duty as a deputy marshal during the period of 2002 through 2004, excluding his light duty restrictions);

Ex. 1, at 80 (testifying that he was carrying a gun and driving and using a government-owned

vehicle during the period of June to August 2004 and noting that despite memory lapses, he

never forgot his gun, placed his gun in an unacceptable location, or ever misused his gun).

Furthermore, in response to defendant's statement of material facts as to which there is no

genuine dispute, plaintiff admits that he "was able to perform his job duties on a regular basis."

Plaintiff's Response to Defendant's Statement of Material Facts as to Which There is no

Genuine Dispute ("Pl.'s Resp."), ¶ 5. While plaintiff adds that he was able to perform his job

duties "because he was working on background investigations, which involved only a limited

physical requirement[,]" id., this statement only serves to undercut his argument that his alleged

memory lapses and blackouts posed a "substantial limitation in his work as a sworn law

enforcement officer required to carry a firearm." Pl.'s Opp'n at 12. In short, because it is

apparent from plaintiff's own sworn testimony that he never sought to be excused from any of

the requirements of his job position, and in fact was able to perform his job duties satisfactorily,

he has failed to create a material issue of fact regarding whether he was significantly limited in

the major life activity of working.[3]

---

[3]Plaintiff's citation to Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 764 (3d Cir. 2004) does nothing to assist his argument that he was substantially limited in the major life activity of working. Pl.'s Opp'n at 12. In Williams, the Third Circuit held that a reasonable jury could conclude that the plaintiff was substantially limited in the major life activity of working because his depression precluded him from carrying a firearm. 380 F.3d at 764. Specifically, the plaintiff was precluded from working in a broad class of law enforcement positions. Id. Williams has no applicability in this case because plaintiff here was never precluded from carrying a firearm; and, in fact, plaintiff has conceded that he was able to perform his duties satisfactorily "because he was working on background investigations, which involved only a limited physical requirement." Pl.'s Opp'n, Ex. A, ¶ 5.

**II.    Plaintiff Has Failed to Create a Genuine Issue of Fact Regarding Whether His Supervisors Knew of His Alleged Disability.**

Plaintiff contends that "[a]gency management officials were aware of [p]laintiff's problems at work and discussed them among themselves."  Pl.'s Opp'n at 12 (citing Compl. ¶ 38).  However, plaintiff himself testified that he never informed his supervisors about his alleged drug dependency.  Def.'s Mot., Ex. A, at 65-66, 73-76, 90, 99, 173.  Furthermore, the fact that plaintiff's supervisors were aware of "[p]laintiff's <u>problems at work</u> . . ." Pl.'s Opp'n at 12 (emphasis added), does not translate into a finding that they were aware of plaintiff's <u>alleged disability</u>.  "The courts of appeals have overwhelmingly agreed that for [a] causal link to be shown [between the plaintiff's disability and the alleged discrimination] the employer must have acted with an awareness of the disability itself, and not merely an <u>awareness of some deficiency in the employee's performance that might be a product of an unknown disability</u>."  <u>Crandall v. Paralyzed Veterans of America</u>, 146 F.3d 894, 896-97 (D.C. Cir. 1998) (emphasis added).  <u>See also</u> <u>Evans v. Davis Mem'l Goodwill Industries</u>, 133 F. Supp. 2d 24, 28 (D.D.C. 2000) ("Employers can only be held liable for discriminating on the basis of 'known' disabilities.  The disabled employee typically has the burden of providing notice of the disability <u>and the limitations it imposes</u>." (citing <u>Crandall</u>, 146 F.3d at 894) (emphasis added).  Thus, the fact that plaintiff contends that there was allegedly a memorandum that confirmed that agency officials "had been concerned about [p]laintiff's erratic behavior at work for several months[,]" Pl.'s Opp'n at 12, does nothing to establish that plaintiff's supervisors were in fact aware of his alleged disability – drug dependency[4] – and the alleged limitations that it imposed on his

_____

[4]Plaintiff does not allege that he was not accommodated for his alleged chronic back injuries, and he was in fact accommodated by being placed on light duty after his back surgeries.

8

performance.  See Crandall, 146 F.3d at 898 (rejecting plaintiff's argument that "his rude

behavior itself was so extreme as to afford notice [of his alleged disability] . . . . A layman

cannot reasonably be expected to infer a psychiatric disorder merely from rudeness, given the

prevalence of rudeness without psychiatric disorder."); Evans, 133 F. Supp. 2d at 28 ("Nor can

an employer assume that an employee with a disability suffers from a limitation . . . Rather, the

employee must indicate not only a disability, but also any job related limitation stemming from

that disability.") (citation omitted).[5]

Plaintiff also asks the Court to speculate that his managers were aware of his disability by

virtue of his contact the Employee Assistance Program ("EAP").  Pl.'s Opp'n at 13.  Plaintiff

notes that although EAP communications are "generally deemed confidential, there is an explicit

exception for situations where an employee poses a 'danger to himself/herself, or to others . . . ."

Pl.'s Opp'n at 13.[6]  According to plaintiff's theory, as "a sworn law enforcement officer,

carrying a firearm in the course of his duties, poses a significant threat to himself and others . . .

[,]" and therefore it is reasonable to assume that EAP personnel "promptly forwarded the

information about [plaintiff] to [a]gency management officials."  Id.  First, this argument should

be rejected because it is based purely on speculation.  Second, plaintiff does not explain why the

---

Def.'s Mot., Ex. A, at 20-21, 34-35.

[5]In addition, further weakening plaintiff's argument that his supervisors were aware of
his alleged disability is plaintiff's testimony that his supervisors did not see him on a daily basis,
and "people did notice [any alleged differences in his appearance and work performance] as
much . . . because I was working alone more. . . . [But] I was aware of the changes."  Def.'s
Mot., Ex. A, at 72-73.

[6]Although plaintiff denies defendant's statement of fact that plaintiff was aware that
contact with an EAP counselor was confidential, Pl.'s Resp. ¶ 9, plaintiff specifically agreed at
his deposition that he understood that an employee can contact EAP with "confidentiality such
that no one in the [a]gency had to know other than the EAP[.]"  Def.'s Mot., Ex. A, at 9.

EAP counselor would have considered plaintiff a "danger to himself . . . or to others" when plaintiff explicitly told the EAP counselor that he was going to refrain from taking any prescription drugs.  Compl. ¶ 23.  Thus, it is perhaps more reasonable to assume that the EAP counselor did not consider plaintiff to be a danger to himself or others, and thus did not violate the general rule of confidentiality, especially given the lack of any evidence that plaintiff was told that the information would be shared with others.  Third, even assuming his managers received notice of plaintiff's alleged disability, this does not result in a finding that they were aware of any alleged accommodation that he needed to perform his job.  See, e.g., Evans, 133 F. Supp. 2d at 27 (noting that although it was "uncontested that plaintiff told [his employer] about his brain injury[,]" there was no evidence "that plaintiff told [his employer] that the injury had created a mental condition that would affect his ability to accept criticism and otherwise hold the job–the features plaintiff now advances as the basis of his disability.").

The most significant justification for rejecting plaintiff's invitation to speculate is that the argument plaintiff now advances constitutes a complete about-face in his position.  Previously, when attempting to salvage his job position, plaintiff *faulted* the EAP counselor for *failing* to report his alleged disability to agency officials.  Def.'s Mot., Ex. D, at 3 ("The EAP contractor . . . failed to contact the [a]gency's EAP staff to inform them of the situation."); id. at 3, 11 (Noting that plaintiff's wife "contacted the [a]gency's EAP contractor . . . The contractor apparently did not inform the Agency personnel of her contact."); id. at 8 ("The contractor should have immediately contacted the [a]gency's EAP people and informed them of the situation, but did not."); id. at 11 ("The EAP contractor ignored this important warning sign and failed to contact the [a]gency's EAP personnel to inform them of the situation."); id. ("The [a]gency should have

10

been informed of these contacts.").  Now, for the purposes of opposing defendant's motion, plaintiff contends that it is more likely that the EAP counselor in fact shared knowledge of plaintiff's disability with his supervisors.  In short, plaintiff's "belief" that his supervisors were in fact aware of his disability is nothing short of self-serving speculation, which has obviously been manipulated to serve his current purposes.[7]

### III.    Plaintiff's Failure to Request a Reasonable Accommodation is a Sufficient Basis to Grant Defendant Judgment on Plaintiff's Failure to Accommodate Claim.

Plaintiff contends that "[d]efendant reveals a lack of knowledge of the reasonable accommodation requirements of the Rehabilitation Act when he dramatically announces that [p]laintiff's admission that he did not request reasonable accommodation 'sounds the death knell for his claimed denial of a reasonable accommodation.'"  Pl.'s Opp'n at 13-14 (quoting Def.'s Mem. at 11).  Ironically, plaintiff does not address the binding precedent, *from this circuit*, which has held that "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999) (emphasis added).  See also Goodman v. Potter, No. Civ.A. 06-5071, 2006 WL 4449339, at *1 (D.C. Cir. Nov. 14, 2006) (holding that employee failed to establish a prima facie case of disability discrimination for

---

[7]Furthermore, to the extent that plaintiff contends he seeks discovery regarding whether his supervisors had knowledge of his alleged disability, Pl.'s Opp'n at 12-13, plaintiff has failed to properly substantiate this request.  Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had . . . ."  Fed. R. Civ. P. 56(f) (emphasis added).  Plaintiff, however, has failed to present any affidavit explaining the facts that are "essential" to his opposition.  Thus, his argument that discovery is required should be rejected.

failure to accommodate where there was "nothing in the record that demonstrates appellant requested or substantiated her need for any day-shift accommodation . . . .") (citation omitted); Evans, 133 F. Supp. 2d at 27 ("It similarly lies with the disabled employee to request needed accommodation.") (citations omitted).  In addition to failing to address the cases in this district, plaintiff also fails to address his prior sworn testimony that, aside from the light duty that he received, he never requested any accommodation.  Def.'s Mot., Ex. A, at 55; Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mem.") at 11.  It is indeed plaintiff who has conceded the validity of defendant's argument by failing to substantively refute the cases cited by defendant.

Faced with the undisputed fact that he never actually requested an accommodation, plaintiff contends that, "[a]s defendant himself concedes, an employer is responsible for providing reasonable accommodation when it is 'aware' of an employee's disability."  Pl.'s Opp'n 14 (citing Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002).  It is not apparent how defendant has "conceded" this point by citation to Scarborough.  Scarborough merely stated that in establishing a prima facie case of a failure to accommodate, the plaintiff must show he was (1) disabled; (2) "that the employer had notice of his disability"; (3) that with reasonable accommodation plaintiff could perform the essential functions of the position; and (4) "the employer refused to make such accommodations."  Id. at 19.  However, the Scarborough court went on to quote from Flemmings in noting that "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation . . . .'"  Id. at 23 (quoting Flemmings, 198 F.3d at 861).  And the Scarborough court went on to grant summary judgment to the employer because plaintiff could not "overcome the undisputed

12

evidence that he did not request a reasonable accommodation." Id. at 27. Thus, the case does

not support plaintiff's argument that he was not required to submit a request for an

accommodation.

Plaintiff also relies upon Smith v. Midland Brake, Inc., 180 F.3d 1154, 1171 & n.9 (10th

Cir. 1999) (en banc) for the proposition that "a disabled employee's failure to explicitly request

reasonable accommodation does not absolve an employer of the legal obligation to provide

reasonable accommodation." Pl.'s Opp'n at 14. Aside from not being binding on this court,

Smith does not support plaintiff's assertion. In fact, the page cited by plaintiff actually supports

defendant's contention that plaintiff had the burden to actually request a reasonable

accommodation: "In general, the interactive process must ordinarily begin with the employee

providing notice to the employer of the employee's disability and any resulting limitations, and

expressing a desire for reassignment if no reasonable accommodation is possible in the

employee's existing job." 180 F.3d at 1171. Footnote nine of the Smith opinion cites cases in

which it has been held that employers are only required to accommodate *known* disabilities and

cites to, among other cases, Miller v. National Cas. Co., 61 F.3d 627, 630 (8th Cir. 1995)

wherein the Eighth Circuit held that an employer "was not obligated to divine the presence of a

disability from [the employee's] extended absence from work and the company's knowledge that

she was in some sort of stressful family situation.'" Smith, 180 F.3d at 1171 & n.9. Thus,

plaintiff's citation to Smith does nothing to further his cause and further supports defendant's

argument that plaintiff's failure to specifically request an accommodation sounds the death knell

for his failure to accommodate claim.

Finally, in a last-ditch effort to salvage his deficient failure to accommodate claim,

plaintiff contends that he "did explicitly request reasonable accommodation."  Pl.'s Opp'n at 14.

According to plaintiff, "[o]n February 24, 2006, [p]laintiff submitted a written response to the

[a]gency's proposal to remove him from service, including a request for accommodation."  Id.

Plaintiff is accurate that, on February 24, 2006, he submitted a "Written Response to Proposal to

Remove Deputy U.S. Marshal Raymond Bonieskie."  Def.'s Mot., Ex. D.  That, however,

concludes the accuracy of his statements.  Nowhere in his February 24th written response did

plaintiff make any request for a reasonable accommodation.  Rather, plaintiff asserted in his

response that he was "fully rehabilitated from his dependency through an . . . EAP-sponsored

treatment program and private medical treatment . . . ."  Id. at 2.  Further, plaintiff maintained

that "[o]n February 22, 2006 [he] . . . was authorized to return to full duty."  Id. at 6.  Therefore,

even assuming that plaintiff had requested an accommodation on February 24, 2006, because

plaintiff repeatedly represented in his written response that he was "full recovered" from his

disability, it is not apparent what accommodation the agency could have provided.  Id. at 7

(plaintiff "has now overcome [his drug dependency] through structured treatment.");  id. (plaintiff

"has now fully recovered.");  id. at 13 ("[Plaintiff] asks that you also consider that the Agency

(and his supervisors) never lost confidence in his abilities and returned him to full duty on

February 22, 2006, in mitigating any penalty issued in this case.");  id. at 14 ("[Plaintiff's]

dedication to rehabilitation has resulted in his recovery from the effects of prescription drug

dependency.");  id. at 16 (plaintiff is "fully rehabilitated from his dependency through an EAP-

sponsored treatment program and to remove him would end the career of a Marshal whose work

performance and career to this point has been an asset to the U.S. Marshals Service.").  In light

of plaintiff's repeated assertions that he was fully rehabilitated and ready to return to full duty,

there was no duty imposed on the agency to seek to accommodate plaintiff.  See, e.g., Evans, 133 F. Supp. 2d at 28 ("Here, given [plaintiff's] assurances that he was able to perform the substance of his job without assistance, [his employer] was not required, and perhaps not allowed, to delve into his medical condition.").

Furthermore, to the extent plaintiff's February 24th response could be construed to have requested a reasonable accommodation, plaintiff was afforded with the accommodation he sought.  He was permitted to attend an EAP-sponsored rehabilitation program.  Id. at 7 ("The Agency has been right to allow [plaintiff] to go through full treatment and recovery and should now give him the opportunity to return to the federal service now that he is well.").  In addition, as requested in his written response, the agency decided to mitigate plaintiff's termination to a suspension and demotion.  Def.'s Mot., Ex. E.  Thus, to the extent he made a request for a reasonable accommodation in his February 24th letter, plaintiff has received the accommodation he requested.  His failure to accommodate claim should be dismissed.[8]

---

[8]Plaintiff distorts the holding in Brooks v. U.S. Postal Service, EEOC Decision No. 01861322, 1987 WL 776294, at *3 (E.E.O.C. Dec. 28, 1987), which plaintiff cites for the proposition that "when disciplinary action is based on conduct related to a disability, as in this case, the issue is now [sic] whether the agency knew of the disability when the alleged misconduct occurred, but whether it was aware of the disability when it imposed discipline." Pl.'s Opp'n at 14 (citing).  At issue in Brooks was whether the employer should have taken the employee's impairment into consideration when disciplining him for misconduct because the employer regularly took such information into account when disciplining other employees with impairments.  Brooks, 1987 WL 776294, at *3.  The employer contended that it had no knowledge of the employee's impairment prior to his misconduct; however, the EEOC found that the determinative factor was "the agency's knowledge, or lack thereof, at the time it made the decisions to discipline the comparative and appellant." Id.  Given these distinguishing circumstances, Brooks can hardly be cited for the general proposition set forth by plaintiff.

In addition, defendant's actions in disciplining plaintiff were not violative of the Rehabilitation Act.  Plaintiff here was proposed for discharge for his off-duty conduct that resulted in him colliding with a parked vehicle.  "The Rehabilitation Act only protects against removal 'solely because of [a disability].  It does not prohibit an employer from discharging an

**CONCLUSION**

For the reasons set forth above as well as in defendant's motion to dismiss, or alternatively, for summary judgment, defendant requests that the complaint be dismissed with prejudice, or alternatively, that judgment be entered in defendant's favor.


Dated: September 7, 2007

Respectfully submitted,

   /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

   /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

   /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT

**Of Counsel:**
Lucille C. Roberts
Deputy General Counsel

---

employee for improper off-duty conduct when the reason for the discharge is the conduct itself, and not any handicap to which the conduct may be related."  Richardson v. United States Postal Service, 613 F. Supp. 1213 (D.D.C. 1985) (citations omitted).  See also Wilber v. Brady, 780 F. Supp. 837 (D.D.C. 1992) ("[The Rehabilitation Act] . . . is not designed to insulate [individuals with disabilities] . . . from disciplinary actions which would be taken against the employee regardless of his status.").  In any event, to the extent plaintiff contends that he should have been "accommodated" for his off-duty misconduct, he was granted the specific accommodation he sought – i.e., mitigation of his proposed removal from service to a suspension and demotion. Def.'s Mot., Ex. E.

United States Marshals Service Headquarters
Office of General Counsel
Building CS-3, 12th Floor
Washington, DC 20530-1000

# EXHIBIT 1

1

UNITED STATES MARSHALS SERVICE

RAYMOND BONIESKIE,            )
                             )
           Appellant,        )
                             )
v.                           )
                             )
UNITED STATES MARSHALS       )
SERVICE,                     )
                             )
           Agency.           )


Deposition of:

RAYMOND BONIESKIE

a witness of lawful age, taken on behalf of the Agency,

pursuant to notice, at 1750 Crystal Drive, Square Three,

Seventh Floor Conference Room, Arlington, Virginia, on

June 21, 2006, at 10:00 a.m., before Christina Chesley,

Notary Public in and for the Commonwealth of Virginia

when were present:

        APPEARANCES:

        On behalf of Appellant:

        ROBERT P. WALDECK, Esquire
        John Berry, PLLC
        1990 M Street, N.W., Suite 610
        Washington, D.C.  20036
        (202) 955-1100

        On behalf of Agency:

        LUCILLE C. ROBERTS, Esquire
        United States Marshals Service
        12th Floor, Building CS-3
        Washington, D.C.  20530
        (202) 307-9054

Exhibit ___A___

66

1        A       Marshal Service personnel?  No, I did not.

2        Q       Okay.

3        A       And at what point are we talking about?

4    What timeframe?

5        Q       We're talking about the timeframe you just

6    described late spring, early summer 2004.

7        A       Okay.

8        Q       When you realized that you were acting in a

9    semi-sleep state and performing certain activities.

10        A       In late spring, early summer it was not very

11    often.  I hate to jump around like this.  I honestly

12    am trying to remember exactly how that whole thing

13    went.

14        Q       That's fine.

15        A       I believe at that point it happened a couple

16    of times, and I was a bit concerned about getting up

17    in the middle of the night.  I would vaguely remember

18    the next day.  I was more concerned when I would yell

19    at my kids, scream at my kids.  At that point also by

20    early summer my aunt had died and my wife and children

21    were involved in a horrific car accident while I was

22    out in California attending my aunt's funeral.

23        Q       That's horrible.

24        A       I had to fly my -- I don't know if it's

25    relevant about the accident or not, but I had to fly

67

1    back and go down and pick up my wife, and our truck

2    had flipped over three times with my family in it, and

3    my sister-in-law was driving, not my wife.  They were

4    coming on the interstate, and she was doing the mom

5    thing handing juices in the back, so she wasn't seat

6    belted.

7         They were just getting up to speed, and then

8    they hit a trailer, and it jackknifed and flipped the

9    truck over three times.  She was banged up pretty bad,

10   so I had to fly.  I had just flown out to California.

11   I had to turn right around and fly back, go down and

12   get her.  She was in so much pain it took two days to

13   get her back home.

14        Got her back home, turned right back around,

15   had to drive all the way back down to North Carolina

16   with a truck, get all the stuff and bring it back and

17   put it into storage and then start taking care of all

18   the insurance, and we were supposed to be meeting down

19   there for Disney World, so that was just a horrific

20   time, so that really took a front seat for about the

21   next month or so.

22        I had not really at that point -- I'm sure

23   some of these behaviors were still going on.  I was

24   not as concerned about them as I was about getting my

25   life back in order and taking care of my wife.  It

68

1    took about a week or so.  Luckily she was not too

2    badly hurt.  The side air bags deployed, otherwise she

3    would have been killed.

4         Q    It was a horrible, horrible time.

5         A    It was a horrible time.

6         Q    So everyone else was all right?

7         A    The children were okay believe it or not.

8    The children were okay.  My wife was banged up pretty

9    bad, and it took a real toll on me physically as far

10   as my back went because of trying to load everything

11   up, and it just -- so that kind of consumed me from

12   the next month until the end of July.

13        Q    Okay. I can see that.

14        A    I'm sorry.  I need to ask him one more

15   question.

16             MS. ROBERTS:  Sure.

17             (Discussion held off the record.)

18             BY MS. ROBERTS:

19             THE WITNESS:  That consumed me for about the

20   next month, probably until the end of July trying to

21   get my life back together.  My family's life back

22   together.

23             BY MS. ROBERTS:

24        Q    Now, this would have been June/July of 2004?

25        A    2004.  It was two years ago this week as a

69

1    matter of fact.

2        Q    Okay.  You can celebrate everybody being

3    home.

4        A    Yes.  Well, my wedding anniversary is on

5    Friday, so it took place right around that whole --

6        Q    Happy anniversary.  During this period of

7    the car accident when this happened, did you continue

8    on the same schedule of prescription drugs that you

9    described earlier?

10       A    I was off work for about three weeks.  I

11   probably was taking heavier during that time because I

12   was really having problems with my back after the

13   accident.

14       Q    What's heavier mean?

15       A    Probably 10 to 12 a day.

16       Q    Ten to 12 Percocet?

17       A    A day.

18       Q    A day, and were you taking Ambien?

19       A    Ambien at night.

20       Q    Every night?

21       A    Yes, ma'am.

22       Q    How many?

23       A    One.

24       Q    One, so you were off during that period?

25       A    I was off for about two to three weeks.

70

1     Q     Okay.  So during the two to three weeks you

2     were on a heavier schedule, right?

3     A     I was on a heavier schedule.

4     Q     Then you went back to work after that full

5     time or part time?

6     A     Full time.  Excuse me.  At the end of July

7     we did finally -- I believe I was off for about two,

8     two and a half weeks around the accident, came back to

9     work for about a week and a half, two weeks, and then

10     we were finally able to take a train down, but went

11     down to Disney World any way and were down there about

12     two weeks.

13     Q     So you were on vacation?

14     A     At the end of July we went down to Disney

15     World for two weeks, so probably that five to six week

16     period I probably only worked about a week and a half

17     to two weeks.

18     Q     Okay.  So during that week and a half to two

19     weeks you were on duty, did you maintain the same drug

20     schedule of 10 to 12 Percocet a day and one Ambien at

21     night?

22     A     No, I was probably back down to probably

23     about eight a day.

24     Q     Eight per day.

25     A     And it may have been nine.  I'd come home

Heritage Reporting Corporation
(202) 628-4888

71

1    and take I think three, three and three at that point.

2         Q    Okay.  Eight or nine Percocet per day, and

3    again it was within eight hours of your work schedule?

4         A    Yes, I would rationalize it.  I was doing

5    okay because I would take it before midnight.

6         Q    And the one Ambien.  Were you sleepwalking

7    during this time as you described before?

8         A    I don't believe during that month I probably

9    did.  It's possible.  There were incidents all the way

10   through.

11        Q    Okay.  And did you exhibit the behavior that

12   you described as irritable, tired, memory loss during

13   the period?

14        A    Yes.

15        Q    Okay.  Did you notice any difference in your

16   ability to react?  Your reflexes?

17        A    I'm sure there were.  On the outside looking

18   in I'm sure there were.

19        Q    Okay.

20        A    I need to ask him one question.

21             MS. ROBERTS:  Certainly.

22             (Discussion held off the record.)

23             MS. ROBERTS:  Okay.  I'm not sure where we

24   left off.

25             MR. WALDECK:  I have the words "noticed

72

1    difference."

2              THE WITNESS:  Noticed difference in my

3    physical --

4              MS. ROBERTS:  Yes.

5              MR. WALDECK:  Ability to react.

6              THE WITNESS:  Ability to react.

7              BY MS. ROBERTS:

8    Q    Okay.  And you said that in retrospect you

9    believed that your reflexes were slow or something to

10   that effect?

11   A    Yes, I'm sure everything was getting pretty

12   messed up at that point.

13   Q    Did you notice any differences in your

14   behavior or your ability at work?

15   A    Yes.  We're talking July to August at this

16   point?

17   Q    Yes, in 2004.

18   A    2004.  Yes, my personal hygiene had pretty

19   much been sacrificed.  I was only taking one or two

20   showers a week where I usually used to take a shower

21   daily.  I was going in very tired, putting my head

22   down on the desk, have a hard time concentrating,

23   forgetting things, leaving things where I shouldn't

24   have.

25   Q    Like what?

73

1      A    I was told later on I had left a couple of

2    files out in the U.S. Attorney's office out in the

3    waiting room on the 11th floor up there.  I believe I

4    left them out in a semi-public area.  I didn't know

5    that at the time.  I found that out later on.  Just a

6    general lack of -- my work production had gone down

7    quite a bit.  I was not producing the amount of work I

8    was before.

9      Q    Okay.  Anything else?

10     A    That's pretty much it, but just general

11   appearance, you know, my appearance had been shot,

12   work product, not caring as much, putting my head

13   down.  I was working on backgrounds, so I did not --

14   it was easier to get away with it at the time I guess.

15   People didn't notice as much I guess because I was

16   working alone more.

17     Q    Were you working out of the office?

18     A    Yes, and in the field doing interviews.

19     Q    So your supervisors would not see you on a

20   daily basis to notice the change?

21     A    No, no.

22     Q    Okay.  But you were aware of the changes?

23     A    I was aware of the changes.

24     Q    Did the changes seem dramatic to you?

25     A    Gradual then after we came back from Disney

74

1    World in August and September, especially after the

2    holidays, after Labor Day it's like it goes gradually

3    and steeper, steeper and then like that.

4    Q    Okay.

5    A    It's my hygiene, behavior, basic mental

6    focus and things like that.

7    Q    Okay.  We are on an audio system.

8    A    I'm sorry.

9    Q    No, no, no.  That's all right, and correct

10    me if I'm wrong let the record reflect that the

11    witness had his hand up and then took a slope down.

12    A    I can actually probably describe it.

13    Q    Okay.

14    A    It's like being on a roller coaster.  When

15    you come over the top of the roller coast, you get a

16    slight dip, and then it goes into a very steep dive

17    probably would be the best way to describe it.

18    Q    Much better story.

19    A    Thank you.

20    Q    So during the gradual decline, did you have

21    any conversations at work as to the problems you were

22    experiencing?

23    A    No.

24    Q    With the Marshal Service?

25    A    No.  At one point, no, no.

1      door.  I would take another -- my wife had moved out

2      of the room by then.

3          Q    Okay.  Now, during this period from June to

4      August of 2004, you were carrying a gun as a deputy?

5          A    Yes.

6          Q    And you were driving and using a government-

7      owned vehicle?

8          A    Yes.

9          Q    Did you have a government-owned vehicle to

10     drive back and forth from work?

11         A    Yes.

12         Q    Okay.  Now, you also said you were

13     forgetting things?

14         A    Yes.

15         Q    Did you ever forget your gun?

16         A    No.

17         Q    Did you ever put your gun in a place that

18     was not an accepted holster or an accepted receptacle?

19         A    During that timeframe?

20         Q    Yes.

21         A    No.

22         Q    Okay.  Did you ever misuse your gun in any

23     way during that period?

24         A    No.

25         Q    Did you have any car accidents?